498 A.2d 605

**BETHLEHEM STEEL CORPORATION**

v.

**G.C. ZARNAS AND CO., INC.**

**No. 103, Sept. Term, 1984.**

Court of Appeals of Maryland.

Oct. 7, 1985.

Thomas M. Trezise, Baltimore (Benjamin R. Goertemiller and Semmes, Bowen & Semmes, Baltimore, on brief), for appellant cross-appellee.

Donald K. Krohn, Baltimore (Donald L. Merriman and Merriman & Mann, P.A., Baltimore, on brief), for appellee cross-appellant.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ., and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired), specially assigned.

ELDRIDGE, Judge.

This case presents a conflict of laws question, namely whether a provision of a construction contract executed in Pennsylvania, whereby the promisor agreed to indemnify the promisee against liability for damages resulting from the sole negligence of the promisee, is so contrary to Maryland public policy that it is unenforceable in a Maryland Court.

On February 14, 1977, G.C. Zarnas and Co., Inc. and Bethlehem Steel Corporation entered into a contract in Bethlehem, Pennsylvania. Zarnas is a Maryland corporation with its principal place of business in Pennsylvania. Bethlehem is a Delaware corporation also having its principal place of business in Pennsylvania. Under the contract, Zarnas was to perform painting services at Bethlehem's Sparrows Point, Maryland, plant during 1977, 1978 and 1979. The seventh paragraph of the contract, headed "RESPONSIBILITY AND INSURANCE," provided in part as follows:

"The Contractor shall indemnify and save harmless each of the Bethlehem Companies from and against all loss or liability for or on account of any injury (including death) or damages received or sustained by the Contractor or any of its subcontractors or any employee, agent or invitee of the Contractor or any of its subcontractors by

reason of any act or omission, whether negligent or otherwise, on the part of any of the Bethlehem Companies or any employee, agent or invitee thereof on the condition of the Site or other property of any of the Bethlehem Companies or otherwise. The Contractor shall further indemnify and save harmless each of the Bethlehem Companies from and against all loss or liability for or on account of any injury (including death) or damages received or sustained by any person or persons by reason of any act or neglect on the part of the Contractor or any of its subcontractors or any employee, agent or invitee of the Contractor or any of its subcontractors, including any breach or alleged breach of any statutory duty which is to be performed by the Contractor hereunder but which is or may be the duty of any of the Bethlehem Companies under applicable provisions of law. For the purpose of this Agreement, the term 'Bethlehem Companies' shall include Bethlehem Steel Corporation, a Delaware corporation, its successors and assigns, and any and all companies and corporations directly or indirectly subsidiary to said Bethlehem Steel Corporation and the successors and assigns of any of them."

On November 5, 1978, George Karavas, a Zarnas employee, was performing services under the contract at the Sparrows Point plant. He was injured when he came in contact with high voltage electricity at the plant. Karavas subsequently filed a negligence action against Bethlehem in the United States District Court for the District of Maryland. While this suit was pending, Bethlehem instituted the present declaratory judgment action against Zarnas in the Circuit Court for Baltimore County.[1] Bethlehem sought a declaration of rights under the indemnity provision of the contract, contending that under Maryland choice of law

---

1. Bethlehem subsequently settled the suit with Karavas and, after doing so, amended its declaratory judgment action against Zarnas, seeking costs and expenses of the settlement. The trial court dismissed without prejudice this part of Bethlehem's suit, and the dismissal is not challenged on appeal.

rules the validity of the terms of the contract should be determined by Pennsylvania law. Bethlehem further argued that the indemnity provision was valid under the law of Pennsylvania. In response, Zarnas contended that the indemnity provision in the contract was unenforceable because it provided for indemnification for Bethlehem's sole negligence. Zarnas argued that this State's public policy required the application of Maryland law, making the provision void and unenforceable.

The circuit court concluded that the agreement, insofar as it required Zarnas to indemnify Bethlehem for Bethlehem's *sole* negligence, is against Maryland's "strong public policy" and, therefore, is not enforceable. The court relied upon Maryland Code (1974, 1984 Repl.Vol.), § 5–305 of the Courts and Judicial Proceedings Article, which provides as follows:

"A covenant, promise, agreement or understanding in, or in connection with or collateral to, a contract or agreement relating to the construction, alteration, repair, or maintenance of a building, structure, appurtenance or appliance, including moving, demolition and excavating connected with it, *purporting to indemnify the promisee against liability for damages arising out of bodily injury to any person or damage to property caused by or resulting from the sole negligence* of the promisee or indemnity, his agents or employees, *is against public policy and is void and unenforceable.* This section does not affect the validity of any insurance contract, workmen's compensation, or any other agreement issued by an insurer." (Emphasis added.)

The circuit court determined, however, that Maryland public policy did not prohibit agreements providing for indemnification for a claim arising out of the *concurrent* negligence of Bethlehem and Zarnas or the *sole* negligence of Zarnas. Furthermore, the court held that the indemnification clause covered the concurrent negligence of the parties as well as the sole negligence of either party. Thus, according to the court, if Bethlehem established that Zarnas was either

concurrently or solely negligent in connection with the injury to Karavas, Bethlehem could recover from Zarnas under the indemnification provision of the contract.

Both parties appealed to the Court of Special Appeals. Prior to argument in the intermediate appellate court, the parties filed in this Court a joint petition for a writ of certiorari which we granted. In its appeal, Bethlehem challenges the trial court's decision that Maryland public policy renders unenforceable the provision indemnifying Bethlehem against its sole negligence. Zarnas, in its cross-appeal, disagrees with the trial court's decision that Bethlehem would be entitled to indemnification if Bethlehem and Zarnas were concurrently negligent.

(1)

In deciding questions of the validity and construction of contracts, a Maryland court ordinarily looks to the law of the place of making of the contract (*lex loci contractus*). *Traylor v. Grafton*, 273 Md. 649, 660, 332 A.2d 651 (1975), and cases there cited. The contract before us was made in Pennsylvania, and, under Pennsylvania case law, the indemnification clause in question is valid and enforceable. *See Westinghouse Electric Co. v. Murphy, Inc.*, 425 Pa. 166, 173 note 5, 228 A.2d 656 (1967).

The *lex loci contractus* principle will not be applied, however, in some circumstances. Long ago, in *Trasher v. Everhart*, 3 G. & J. 234, 244 (1831), our predecessors stated:

"It is a universal principle, governing the judicial tribunals of all civilized nations, ... that the *lex loci contractus* controls the nature, construction, and validity of the contract. Courts will always look to the *lex loci*, to give construction to an instrument, and will impart to it validity, according to those laws, *unless it would be* dangerous, *against public policy*, or of immoral tendency *to enforce it here."* (Emphasis added.)

The conflict of laws rule, that *lex loci contractus* does not apply to a contract provision which is against Maryland public policy, has been consistently recognized by this

Court. *See, e.g., Traylor v. Grafton, supra,* 273 Md. at 660, 332 A.2d 651; *Henderson v. Henderson,* 199 Md. 449, 458–459, 87 A.2d 403 (1952); *Credit Co. v. Marks,* 164 Md. 130, 141–146, 163 A. 810 (1933); *Pleasanton v. Johnson,* 91 Md. 673, 675, 47 A. 1025 (1900); *Moore v. Title and Trust Co.,* 82 Md. 288, 290, 33 A. 641 (1896); *Baltimore and Ohio Rail Road Company, et al. v. Glenn, et al.,* 28 Md. 287, 321–322 (1868); *De Sobry v. De Laistre,* 2 H. & J. 191, 228–230 (1806).

Bethlehem argues, however, that the *lex loci contractus* rule should be deemed inapplicable on public policy grounds "only when the application of that [foreign] law violates a *strong* public policy of this State." (Brief, p. 8.) Bethlehem points out "that a mere difference between the policies of the jurisdictions involved would not justify a refusal to follow the [foreign] ... law," as otherwise "[t]he public policy exception to choice of law principles would thus swallow the choice of law analysis...." (*Id.* at pp. 13, 17.) This Court's opinions which Bethlehem relies upon are *Texaco v. Vanden Bosche,* 242 Md. 334, 340, 219 A.2d 80 (1966), and *Harford Mutual v. Bruchey,* 248 Md. 669, 674, 238 A.2d 115 (1968).

We fully agree that merely because Maryland law is dissimilar to the law of another jurisdiction does not render the latter contrary to Maryland public policy and thus unenforceable in our courts. Rather, for another state's law to be unenforceable, there must be "a strong public policy against its enforcement in Maryland," *Texaco v. Vanden Bosche, supra,* 242 Md. at 340–341, 219 A.2d 80, or "a public policy sufficient to require the application of law other than the law of the place of the [contract]," *Harford Mutual v. Bruchey, supra,* 248 Md. at 676, 238 A.2d 115. In our view, however, the circuit court correctly held that Maryland public policy is sufficiently strong to preclude an application of Pennsylvania law under the circumstances of this case.

■ This is not a situation where Maryland law is simply different from the law of another jurisdiction. Here, the General Assembly of Maryland has specifically addressed clauses in construction contracts providing for indemnity against the results of one's sole negligence, and has unequivocally told the Maryland judiciary that such a clause "is void and unenforceable." § 5–305 of the Courts and Judicial Proceedings Article. Moreover, in the same sentence of the statute, the General Assembly expressly stated that such indemnity provision "is against public policy." [2] Unless there is a contrary indication elsewhere, and absent constitutional considerations, the General Assembly's explicit determination of public policy is sufficient in a case like this to override the *lex loci contractus* principle.[3]

Our conclusion, that § 5–305 of the Courts and Judicial Proceedings Article reflects a public policy sufficient to override the application of Pennsylvania law under the circumstances of this case, is entirely consistent with *Texaco v. Vanden Bosche, supra,* 242 Md. 334, 219 A.2d 80, and *Harford Mutual v. Bruchey, supra,* 248 Md. 669, 238 A.2d 115, upon which Bethlehem relies. Both *Texaco* and *Harford Mutual* were suits in Maryland based on alleged wrongs occurring in Virginia. An issue in both cases concerned the enforcement of Virginia statutes. No Maryland statutes were involved. In each case, the Court took

---

**2.** As this Court noted in *Jones v. Malinowski,* 299 Md. 257, 273 n. 4, 473 A.2d 429 (1984), "[d]eclaration of the public policy of the State is normally the function of the legislative branch of government; in discerning that policy, courts consider, as a primary source, statutory ... provisions."

**3.** *But cf. Jarvis v. Ashland Oil, Inc.,* 17 Ohio St.3d 189, 478 N.E.2d 786 (1985), involving somewhat different circumstances from those in the instant case but similar Ohio statutory language. Also, in that case, the contracting parties had agreed that the law of Kentucky should control, and thus no issue of *lex loci contractus* was presented. The Supreme Court of Ohio stated in *Jarvis* that the indemnity provision was "repugnant to and in violation of the public policy of this state" but, nevertheless, "the law of Ohio will only be applied when it can be shown that this state has a materially greater interest than the chosen state in the determination of the particular issue." 478 N.E.2d at 789.

the position that there was no Maryland public policy sufficiently strong to prevent the application of the Virginia statutes.

In the present case, however, the parties contracted in Pennsylvania to do something which Pennsylvania common law merely tolerates.[4] No Pennsylvania statute expressly creates a right of the parties to so contract.[5] On the other hand, a Maryland statute specifically forbids, on public policy grounds, the enforcement of a contractual agreement such as that involved here. Under these circumstances, this Court's opinions in *Texaco* and *Harford Mutual* do not require the application of Pennsylvania law.

More pertinent to this case is *Credit Co. v. Marks, supra,* 164 Md. 130, 163 A. 810. *Marks* involved a priority dispute over an automobile, between the assignee of the seller's interest under a New York conditional sale contract and a garageman claiming a lien under a Maryland statute for repairs made to the vehicle in Maryland after it had been conditionally sold. Although the Court initially held that the plaintiff had failed to prove that New York law gave him priority as a conditional seller over the garageman, the court alternatively resolved the choice of law issue "[i]n the

---

**4.** *See Westinghouse Electric Co. v. Murphy, Inc.,* 425 Pa. 166, 173 n. 5, 228 A.2d 656 (1967) ("A contract indemnifying one against his own negligence is not necessarily against public policy ....").

**5.** That Pennsylvania has no strong interest in having the contract provision enforced here is suggested by the fact that, had suit on the indemnity agreement been brought in Pennsylvania, the Pennsylvania court would likely have decided the issue according to Maryland law. *See Knauer v. Knauer,* 323 Pa.Super. 206, 470 A.2d 553 (1983) (applying significant contacts analysis to choice of law issue in assumpsit). Zarnas is a Maryland corporation. The contract involved was to be performed entirely in Maryland. The injury occurred in Maryland at Bethlehem Steel's Sparrows Point, Maryland, plant. In these circumstances, it would be ironic if, in balancing Maryland public policy against the *lex loci* rule, we were to hold that principles of comity require us to apply Pennsylvania law and ignore that state's conflict of law principles. *See* H. Goodrich and E. Scoles, *Conflict of Laws* § 10, at 11–14 (4th ed. 1964); E. Scoles and P. Hay, *Conflict of Laws* §§ 3.13 and 3.14, at 67–72 (1982); R. Weintraub, *Commentary on the Conflict of Laws,* § 7.4F, at 381–382 (2d ed. 1980).

event the statutory law of New York had been shown to be different from the statutory law of Maryland." 164 Md. at 143, 163 A. 810. The Court observed (*id.* at 141–142, 163 A. 810):

"In a contract of conditional sale, the law of where it was made and where it is to be performed, as a rule, governs its construction and operation in all states, *but the validity of the contract will not be sustained in another state should it contravene the settled policy of the foreign state.* In the case at bar this rule would protect and enforce the rights and interests of the seller or his assignee while the subject-matter of the contract was in transit within this state, in the possession of ·its buyer, a nonresident of the State of Maryland, *provided the giving effect to the laws of the foreign state are not in contravention of the settled law or policy of this state.*" (Emphasis added.)

This Court then stated that the Maryland statute "was the expression of a public policy." *Id.* at 143, 163 A. 810. The *Marks* opinion took the position that, if the New York statute had given priority to the plaintiff, the Maryland statute would nevertheless have prevailed. The Court said that such result "is not violative of established principles of comity, but a refusal to abrogate a statute enacted in the formulation and declaration of the settled policy of this sovereignty." *Id.* at 145, 163 A. 810. The Court concluded its opinion as follows (*id.* at 146, 163 A. 810):

"As is said in *Cooley, Const. Lim.* (8th Ed.), vol. 1, pp. 250, 251: 'The extent to which comity will be extended is very much a matter of judicial policy to be determined within reasonable limitations by each State for itself. In the making of contracts, the local law enters into and forms a part of the obligation; and if the contract is valid in the State where it is made, any other State will give remedies for its enforcement, unless, according to the standard of such latter State, it is bad for immorality, or is opposed in its provisions to some accepted principle of public policy, or unless its enforcement would be preju-

dicial to the State or its people, or would violate its constitution or statutes.' *Pleasanton v. Johnson*, 91 Md. 673, 675–677, 47 A. 1025; *Balto. & O.R. Co. v. Glenn*, 28 Md. 287, 322." *Id.* at 146, 163 A. 810.

Applying the teaching of *Marks* to the case at bar compels the conclusion that Maryland public policy is sufficient to override the *lex loci* rule here.

■ This case is a declaratory judgment action created by Maryland law, involving a tort cause of action under Maryland law. The specific issue concerns a contractually created defense, not arising under or governed by any Pennsylvania statute, which the Maryland General Assembly has barred on express public policy grounds. Under these circumstances, Maryland conflict of laws principles require the application of § 5–305 of the Courts and Judicial Proceedings Article insofar as the indemnity clause provided that Bethlehem would be indemnified for damages resulting from its sole negligence.

### (2)

As previously mentioned, the trial court also held that the parties, in the indemnity provision, intended that Bethlehem would be indemnified for damages resulting from the concurrent negligence of Bethlehem and Zarnas or the sole negligence of Zarnas. The court further held that an agreement providing for indemnification of Bethlehem, if it were concurrently negligent, was not covered by § 5–305 of the Courts and Judicial Proceedings Article and was not otherwise contrary to Maryland public policy.[6]

On appeal, Zarnas does not challenge the trial court's holding that an agreement to indemnify a party for damages resulting from its concurrent negligence is not violative of § 5–305 or of Maryland public policy. Furthermore, Zarnas does not dispute the trial court's conclusion that the

---

6. *See*, in this connection, *Mason v. Callas Contractors, Inc.*, 494 F.Supp. 782, 785 (D.Md.1980).

language of the first sentence of the indemnity provision encompasses Bethlehem's concurrent negligence as well as its sole negligence.[7] Therefore we need not, and do not, express any opinion on these issues.

What Zarnas argues, however, is that the trial court improperly relied upon the first sentence of the indemnity clause in determining the parties' intent with regard to concurrent negligence. Zarnas maintains that, because the first sentence of the clause provides for indemnification of Bethlehem if Bethlehem were solely negligent, and because § 5-305 of the Courts and Judicial Proceedings Article states that such a clause is "void," the statute has the effect of "excising the illegal provision as though it never existed." (Brief, p. 6.) Thus, according to Zarnas, "there should have been no further consideration of the provision by the Court" in determining the intent of the parties with respect to indemnification in a concurrent negligence situation (*ibid.*). Zarnas concludes that, absent the first sentence, there is no "unequivocal" language in the contract providing for indemnification for Bethlehem from claims attributable to its concurrent negligence. Citing *Perry v. Payne*, 217 Pa. 252, 66 A. 553 (1907), and *Crockett v. Crothers*, 264 Md. 222, 285 A.2d 612 (1972), Zarnas argues that, under both Pennsylvania and Maryland law, such unequivocal language is necessary for contractual indemnification of a party when that party is concurrently negligent.

 There are, perhaps, several answers to Zarnas's argument. It is sufficient for present purposes, however,

---

7. The first sentence reads as follows:

"The Contractor shall indemnify and save harmless each of the Bethlehem Companies from and against all loss or liability for or on account of any injury (including death) or damages received or sustained by the Contractor or any of its subcontractors or any employee, agent or invitee of the Contractor or any of its subcontractors by reason of any act or omission, whether negligent or otherwise, on the part of any of the Bethlehem Companies or any employee, agent or invitee thereof on the condition of the Site or other property of any of the Bethlehem Companies or otherwise."

to point out that Zarnas misconceives the effect of § 5–305 of the Courts and Judicial Proceedings Article. The statute does not purport to void or excise an entire contract *provision*. Rather, it renders void and unenforceable a "covenant, promise, agreement or understanding" which purports to indemnify the promisee against liability for damages caused by the promisee's sole negligence. It is the agreement to this effect, and not the entire provision of the contract, which the statute invalidates. Consequently, if a particular contract provision or sentence can properly be construed as reflecting two agreements, one providing for indemnity if the promisee is solely negligent and one providing for indemnity if the promisee and promisor are concurrently negligent, only the former agreement is voided by the statute. In other words, under the circuit court's unchallenged construction of § 5–305, the statute renders unenforceable a contract provision only insofar as it embodies an agreement providing for indemnity to the promisee when the promisee is solely negligent. To the extent that the same contract provision reflects the parties' intent concerning concurrent negligence, the statute is inapplicable. *Cf., Mountain Fuel Supply Co. v. Emerson,* 578 P.2d 1351, 1356 (Wyo.1978).

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE EQUALLY DIVIDED.

RODOWSKY, J., dissents in which MURPHY, C.J., concurs.

RODOWSKY, Judge, dissenting.

I respectfully dissent from part (1) of the Court's opinion. An internal rule of contract law in a statute expressly stating that rule to be public policy does not necessarily express that degree of public policy which prevents applying the *lex loci.* In the case at hand Md.Code (1974, 1984 Repl.Vol.), § 5–305 of the Courts and Judicial Proceedings Article (Courts Article) presents the conflict of laws prob-

lem, but the statute does not, of itself, solve the problem. The statute alerts us to the need for analysis; the statute does not dispense with analysis.

### (1)

Initially we must define the issue. Under its internal law Pennsylvania generally permits parties to agree that one will indemnify the other against the other's negligence, including the sole negligence of the other, if the intention is clearly expressed. *See, e.g., Westinghouse Electric Co. v. Murphy, Inc.*, 425 Pa. 166, 228 A.2d 656 (1967); *Brotherton Construction Co. v. Patterson-Emerson-Comstock, Inc.*, 406 Pa. 400, 178 A.2d 696 (1962); *Tidewater Field Warehouses, Inc. v. Fred Whitaker Co.*, 370 Pa. 538, 88 A.2d 796 (1952); *Perry v. Payne*, 217 Pa. 252, 66 A. 553 (1907); *Urban Redevelopment Authority v. Noralco Corp.*, 281 Pa.Super. 466, 422 A.2d 563 (1980); *Babcock & Wilcox Co. v. Fischbach and Moore, Inc.*, 218 Pa.Super. 324, 280 A.2d 582 (1971). The Pennsylvania statute most analogous to Courts Article § 5–305 voids only those contractual indemnifications in the construction setting which run in favor of architects, engineers, and surveyors. *See* Pa.Stat.Ann. tit. 68, § 491 (Supp.1985).[1]

Consequently, we deal here with a contract provision which is valid and enforceable where made. The importance of this threshold determination cannot be minimized

---

1. The statute reads:

 Every covenant, agreement or understanding in, or in connection with any contract or agreement made and entered into by owners, contractors, subcontractors or suppliers whereby an architect, engineer, surveyor or his agents, servants or employes shall be indemnified or held harmless for damages, claims, losses or expenses including attorneys' fees arising out of: (1) the preparation or approval by an architect, engineer, surveyor or his agents, servants, employes or invitees of maps, drawings, opinions, reports, surveys, change orders, designs or specifications, or (2) the giving of or the failure to give directions or instructions by the architect, engineer, surveyor or his agents, servants or employes provided such giving or failure to give is the primary cause of the damage, claim, loss or expense, shall be void as against public policy and wholly unenforceable.

by the majority's characterization of Pennsylvania law as "merely tolerat[ing]" the subject promise. (At 190). I know of no law which divides contracts valid where made into two subclasses: one composed of contracts which are valid but "merely tolerate[d]," and the other composed of contracts which are valid and enthusiastically embraced. Analysis is not assisted by blurring concepts through purported distinctions which have no legal significance.

When Zarnas argued that the indemnity provision in this Pennsylvania contract was invalid and based that argument on a Maryland statute, Zarnas raised an issue of conflict of laws. Had the contract been made in Maryland, the provision would be void as a matter of Maryland's internal law as expressed in § 5–305. Faced with the conflict, a Maryland court must decide the issue by applying Maryland law, namely, the Maryland law of conflict of laws. The applicable rule of law is that the validity of a contract is determined by the law of the place where it is made. Under this general rule, the provision would be valid. But Zarnas invokes an exception or qualification to the general rule based on the public policy of the forum state. The majority and I part company over the meaning of the exception and over its application to this promise of indemnity.

Obviously the strength of Maryland public policy concerning this promise is not relative, either directly or inversely, to the strength of Pennsylvania policy on the same subject. This Court has not adopted the balancing of contacts-weighing of interests-center of gravity approach to deciding the validity of a contract. In a related context we recently again refused to abandon the *lex loci delicti* rule in favor of a balancing of interests approach. In that case this Court, through Judge Eldridge, pointed out that "[a] virtue of the [*lex loci delicti*] rule, for the courts and all parties concerned, is predictability and certainty as to which state's tort law will govern." *Hauch v. Connor*, 295 Md. 120, 125, 453 A.2d 1207, 1210 (1983). Predictability is, in my view, even more important with respect to the law governing contract validity. Accidents are unplanned; contracts are

planned. Thus, I regret that the majority finds it necessary to bolster its conclusion with footnote 5. (At 191). There the majority undertakes to minimize the extent of the Pennsylvania interest in the enforcement of the contested promise. That discussion will be interpreted by some to reflect a factor influencing this Court in applying the public policy qualification on the *lex loci contractus* rule. Counsel who represent clients in litigation or who desire contracts for interstate use consequently will be obliged to spend additional billable hours attempting to quantify the substantiality of the interest in enforceability of the state where the contract was made in order to evaluate problems of the instant type.

The majority and I agree that a difference between the laws of two states is not sufficient to trigger a proper application of the public policy qualification. " '[P]ublic policy of the forum' is an elastic kind of a grab bag from which one can take out anything which he chooses to put in." Goodrich, *Public Policy in the Law of Conflicts,* 36 W.Va.L.Q. 156, 170 (1930). The test is a matter of degree. The public policy exception to the *lex loci contractus* rule necessarily refers to a high degree of public policy; otherwise, differences between the laws of sister states would always result in applying the law of the forum so that the public policy exception would swallow the *lex loci contractus* rule. The question is whether Maryland public policy with respect to the subject indemnification provision is so strong that Maryland courts ought not to apply the ordinary *lex loci contractus* rule and ought to refuse to enforce the provision. The majority denies enforcement because Maryland law on the validity of the contract provision is found in a statute which declares public policy by using the words, "public policy." I shall now examine the extent to which statutes are determinative of this issue of degree in conflict of laws.

### (2)

A statute (sometimes called a statute of reference) may state the applicable rule of conflict of laws. But Courts

Article § 5–305 cannot be *conclusive* on the question before us because that statute does not provide the Maryland rule of conflict of laws respecting the subject indemnity clause. A true statutory rule of conflict of laws is illustrated by Courts Article § 3–903(a) dealing with a wrongful death action brought here based on a wrongful act that occurred in another jurisdiction. In such a case "a Maryland court shall apply the substantive law of that jurisdiction."

When the General Assembly enacted § 5–305 by Ch. 634 of the Acts of 1974, it directed that the new statute be codified in the Courts Article under the subtitle, "Prohibited Actions." At that time former § 5–301(a) of the same subtitle (now Md.Code (1984), §§ 3–101 to –105 of the Family Law Article) prohibited the actions for alienation of affections and for breach of promise to marry. The prohibition of former § 5–301(a) applied whether the cause of action "arose in the State or elsewhere." Had the purpose of § 5–305 been both to state an internal rule and to deny enforcement to certain indemnification promises made in other states, the General Assembly certainly had the model for expressing that result in former § 5–301(a).

Consequently, enforcing the valid Pennsylvania contract in this case would not mean that this Court has failed to comply with § 5–305. The statute must be considered when we apply the Maryland common law of conflict of laws because the statute may, or may not, declare an internal Maryland public policy which is strong enough to preclude enforcement of the valid Pennsylvania provision.

All statutes are an expression of public policy. With sincere respect for my colleagues in the majority, I believe that they have confused the public policy involved in a statute stating an internal rule of Maryland law with the fundamental public policy required for a court of one State of the United States of America to refuse enforcement to a contract valid under the laws of a sister state. Maryland common law permits indemnification by express promise— even when the promise requires an employer to pay as

indemnification the amount measured by tort damages received by his employee from the indemnitee, less workers' compensation benefits. *See American Radiator and Standard Sanitary Corp. v. Mark Engineering Co.*, 230 Md. 584, 187 A.2d 864 (1963); *Standard Wholesale Phosphate & Acid Works, Inc. v. Rukert Terminals Corp.*, 193 Md. 20, 65 A.2d 304 (1949); *Baltimore Transit Co. v. State*, 183 Md. 674, 39 A.2d 858 (1944).

The substance of what the General Assembly undertook to do in 1974 by enacting § 5–305 was to make illegal a specific class of contractual promise which had previously been legal. In the future, making such a promise would not be, however, so serious that it would be criminal. Parties who entered into such promises in the future in Maryland would not be imprisoned or fined; nor would such promises be the basis for a civil penalty. All the General Assembly sought to do was to make the specified class of promise unenforceable, as a matter of substantive Maryland contract law. To accomplish that result the General Assembly could have said simply that such clauses are void. Instead it employed the tautology of legalese. But saying the same thing three ways—void, unenforceable, and contrary to public policy—does not automatically elevate this internal rule of Maryland contract law to the level of public policy required under conflict of laws principles. This can be demonstrated by conflict of laws decisions from other states. First, however, I shall review the authority cited by the majority.

The determinative proposition under the majority's analysis is that, "[u]nless there is a contrary indication elsewhere, and absent constitutional considerations, the General Assembly's explicit determination of public policy is sufficient in a case like this to override the *lex loci contractus* principle." (At 190) (footnote omitted). The majority cites no authority which directly supports this proposition. *Universal Credit Co. v. Marks*, 164 Md. 130, 163 A. 810 (1933) is said to "[compel] the conclusion that Maryland public

policy is sufficient to override the *lex loci* rule here." (At 193). *Marks* is not even a conflict of laws holding.

In *Marks* the possessor of an automobile left it with a garage in Baltimore for repairs. The possessor held the car as buyer under a conditional contract of sale made in New York where delivery of the car had taken place and where the conditional contract of sale had been recorded. When the buyer failed to pay the repair charges, the owners of the garage, in order to satisfy their statutory lien, held a public auction at which they bought the car. A finance company, as assignee of the conditional seller, sought to replevy the car. Under the Maryland statute the auto mechanic's lien took priority over a conditional contract of sale, unless the latter were recorded. This Court rejected the argument that recording in New York complied with that aspect of the statute. The Court then posed the question of whether "the doctrine of comity" would justify concluding that the reservation of title prevailed over the statutory lien. *Id.* at 141, 163 A. at 814. The answer was "No" on two grounds. First, the finance company had not proved that under New York law the holder of reserved title prevailed over an auto mechanic's lien. Second, even if New York law gave priority to a conditional seller, the law under which the auto mechanic's lien arose would prevail. This is because the lien is a statutory remedy which attached to the contract to repair under the law of the state where that contract was made. This Court said:

> The principles which determine this conclusion are that the statutory lien of the artisan or garageman is not a matter of contract but of statute law. The lien is not of the right but of the remedy, and is of statutory creation under the law of the state where the contract with reference to the repair, replacements, accessories, or storage of the automobile is made. The lien does not arise by agreement of the parties, but from the exercise of the

will of the sovereign state whence it acquires its binding force. [164 Md. at 144, 163 A. at 815.[2]]

I cannot read *Marks* as applying the public policy qualification on the *lex loci* rule. Nor does there seem to be any Maryland holding on the public policy point presented in the case *sub judice.*

Other courts when dealing with statutes proscribing certain contracts have enforced foreign contracts of the proscribed type because the forum state's policy, even though expressed in a statute, was not sufficiently strong to override the *lex loci* principle. In *Miller v. American Insurance Co.*, 124 F.Supp. 160 (W.D.Ark.1954), the court dismissed an action brought in Arkansas by a Texas resident against the insurer of an automobile destroyed by fire in Arkansas. The court enforced an arbitration provision which was valid in Texas, where the policy had been written and issued, despite an Arkansas statute providing: " 'No policy of insurance shall contain any condition, provision or agreement which shall directly or indirectly deprive the insured or beneficiary of the right to trial by jury on any question of fact arising under such policy, *and all such provisions,* conditions or agreements *shall be void.'* " *Id.* at 162 n. 3 (emphasis added). The court reasoned that the exception to the *lex loci contractus* rule "is applicable only in cases where the public policy which is offended is a

---

**2.** The excursion by the *Marks* court down the path of the "doctrine of comity" produces the passages from *Marks* quoted by the majority in this case. Although the opinion in *Marks* quickly retreated back up this path and actually held that a Maryland repair contract was involved, even the concept of comity explored by the *Marks* court is not within modern, interstate, conflict of laws principles. *Marks* seems to me to have been discussing a possible extension of courtesy under which Maryland would here treat a New York holder of reserved title, vis-a-vis a mechanic, in the same way in which New York would there treat parties who stood in the same relationship. That is an approach to relations between sovereigns, at the level of sovereign to sovereign. A court of the forum state does not act as the sovereign. Such an approach is properly the subject of interstate agreements or of legislation, the operation of which is frequently conditioned on reciprocal legislation in a sister state.

*strong* public policy of the forum ...." *Id.* at 162 (emphasis in original). The court further said:

There is certainly nothing inherently wrong, immoral or against natural justice in arbitration agreements; on the contrary, the modern tendency of the courts is to look with favor upon such agreements, at least to some extent. ... Nor do we think that to uphold the arbitration provision included in the policy in suit would in any manner prejudice the State of Arkansas or any of her citizens. Granting that Arkansas has the right to protect her own citizens from policy provisions of this kind, and that she has made void by statute such provisions in insurance policies written in this State, it does not follow that she has any legitimate interest in regulating the dealings between insurance companies and citizens of other states expressed in insurance policies written and delivered elsewhere. On the contrary, it seems to us that to so hold would be to give an unreasonable out-of-state scope to a statute, which we think was designed for the protection of Arkansas people. [*Id.* at 163 (citation omitted).]

*Miller* cited, *inter alia, Dodd v. Axle-Nut Sign Co.,* 126 Ark. 14, 189 S.W. 663 (1916). There the defendant, a citizen and resident of Arkansas, bought from the plaintiff, a Kentucky corporation, a one-third interest in a patented device. The contract and a note evidencing the balance of the purchase price were made and delivered in St. Louis, Missouri. An Arkansas statute regulated the sale on credit of any interest in patented machines and provided that " 'all such notes not showing on their face for what they were given shall be absolutely void.' " *Id.* at 18, 189 S.W. at 664. In a suit on the note in Arkansas the buyer defended on the basis of this statute. Judgment for the seller was affirmed because the agreement was a Missouri contract which "will be enforced and adjudicated by the courts of [Arkansas] precisely as it would be adjudicated in the courts of the State of Missouri." *Id.*

Both constitutional and statutory provisions of the forum state were involved in *Intercontinental Hotels Corp. v.*

*Golden,* 15 N.Y.2d 9, 254 N.Y.S.2d 527, 203 N.E.2d 210 (1964), a decision which nearly every commentator on conflict of laws has subsequently cited on the public policy qualification to a *lex loci* rule. Suit was brought in a New York court to recover from a New York resident a gambling debt incurred in a casino in Puerto Rico where the gambling contract was legal. A trial court judgment for the plaintiff was reversed by the Appellate Division which applied the public policy qualification. The intermediate appellate court noted that the New York State Constitution provided that " 'no lottery ... book-making, or any other kind of gambling, except pari-mutuel betting on horse races * * * shall hereafter be authorized or allowed within this state.' " 18 A.D.2d 45, 46, 238 N.Y.S.2d 33, 35 (1963). That court noted that "Article 88 of the Penal Law contains numerous provisions making different types of gambling criminal offenses." *Id.* The New York Court of Appeals reversed, saying:

> Substantially all of the commentators agree that foreign-based rights should be enforced unless the judicial enforcement of such a contract would be the approval of a transaction which is inherently vicious, wicked or immoral, and shocking to the prevailing moral sense. (Beach, Uniform Interstate Enforcement of Vested Rights, 27 Yale L.J. 656, 662; Goodrich, Conflict of Laws [3d ed., 1949], 305; 2 Rabel, Conflict of Laws: A Comparative Study [1947], 555–575; Paulsen and Sovern, "Public Policy" in the Conflict of Laws, 56 Col.L.Rev. 969; 3 Beale, Conflict of Laws [1935], 1649.) [15 N.Y.2d at 13, 254 N.Y.S.2d at 529, 203 N.E.2d at 212.]

The court said that "if we are to apply the strong public policy test to the enforcement of the plaintiff's rights under the gambling laws of the Commonwealth of Puerto Rico, we should measure them by the prevailing social and moral attitudes of the community ...." *Id.* at 14, 254 N.Y.S.2d at 530–31, 203 N.E.2d at 213. In the light of legalized pari-mutuel betting, the operation of bingo games, and the lack of any indication that gambling permitted in Puerto Rico

but prohibited in New York would spill over into the latter state if the debts claimed by the plaintiff were enforced, the New York Court of Appeals concluded that the case fell "within the consistent practice of enforcing rights validly created by the laws of a sister State which do not tend to disturb our local laws or corrupt the public." *Id.* at 17, 254 N.Y.S.2d at 533, 203 N.E.2d at 214. *Accord Caribe Hilton Hotel v. Toland,* 63 N.J. 301, 307 A.2d 85 (1973); *Pineiro v. Nieves,* 108 N.J.Super. 51, 259 A.2d 920 (1969).[3]

The majority's standard of an explicit legislative determination of public policy may also be tested by cases involving sales of liquor. For example, *Veytia v. Alvarez,* 30 Ariz. 316, 247 P. 117 (1926) was a suit to recover the purchase price of liquor sold in Mexico to an Arizona resident. The seller sued in Arizona where the defendant argued enforcement of the contract "would be in contravention of the public policy of this country and state as expressed by the Eighteenth Amendment, the Volstead Act ... and the state constitutional and statutory provisions against the sale, manufacture, etc., of intoxicating liquors." *Id.* at 317, 247 P. at 118. The court enforced the contract on the principle that

> there is no public policy that will justify the refusal of a court to extend comity under such a state of facts, unless the transaction involved is regarded in the exercise of a judicial discretion as inherently vicious, wicked or immoral, or (what is probably the same thing) where the judicial enforcement of such contract would present to our people an example pernicious and detestable—shocking to the prevailing moral sense, to use the language of other courts. [*Id.* at 318, 247 P. at 118.]

---

**3.** Application in this State of the majority's analysis to gambling contracts would require consideration of 16 Charles II Ch. 7 and 9 Anne Ch. 14, II J. Alexander, *British Statutes in Force in Maryland* (W. Coe 2d ed. 1912). Both statutes were said to be in force in Maryland in *Spies v. Rosenstock,* 87 Md. 14, 17, 39 A. 268, 269 (1898). Both statutes contain express language declaring the gaming contracts therein described to be void.

The Arizona court supported its conclusion by an extensive review of the then authorities.

The liquor cases are reviewed in Annot., 49 A.L.R. 1002 (1927) where the editors conclude:

It is generally recognized that a contract for the sale of liquor, made in one state and valid therein, is enforceable in another state, even though, had the contract been made there, it would have been illegal, where in the making of such contract it was not contemplated or intended that the law of the other state should be violated . . . . [*Id.* at 1003.]

(3)

Because the incorporation in Courts Article § 5–305 of the words, "against public policy," does not answer the conflict of laws question, the majority should go on and determine whether the public policy underlying § 5–305 is of the degree which prevents enforcing a valid foreign contract. To do this does not require constructing a litmus test, as the cases cited in part (2) hereof illustrate.

A frequently quoted standard is found in the opinion by Judge Cardozo for the New York Court of Appeals in *Loucks v. Standard Oil Co.*, 224 N.Y. 99, 120 N.E. 198 (1918). In attempting to put to rest in that state the notion that a forum could enforce claims under a foreign wrongful death statute only if it were similar to the wrongful death statute of the forum state, the *Loucks* opinion said that courts do not "close their doors, unless help would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal." *Id.* at 111, 120 N.E. at 202.[4] Judge Cardozo's words are adopted to express the minimum standard

---

4. *But cf. Kilberg v. Northeast Airlines, Inc.,* 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961) (refusing, on public policy grounds, to apply a $15,000 limit on recovery in the Massachusetts wrongful death act).

for the *lex loci* qualification in H. Goodrich, *Handbook of the Conflict of Laws* § 11, at 22 (1949).

Early on, this Court said that the *lex loci* rule did not apply "[w]here the contract is *contra bonos mores,* as for the price of prostitution ...." *De Sobry v. De Laistre,* 2 H. & J. 191, 228 (1806). Judge Hammond, writing for the Court in *Texaco, Inc. v. Vanden Bosche,* 242 Md. 334, 340, 219 A.2d 80, 83 (1966), summarized current legal thinking and concluded "that a public policy which will permit a state to refuse to enforce rights created by the law of a sister state must be very strong indeed." The first of a series of citations given in support of the quoted statement in *Texaco* was to Paulsen & Sovern, *"Public Policy" in the Conflict of Laws,* 56 Colum.L.Rev. 969 (1956). Those authors conclude in part that

> [a]ll the commentators would retain the public policy principle in conflicts to the extent that it is grounded in basic moral conceptions or in ideas of fundamental justice, and we agree. If the foreign law normally applicable violates the strongest moral convictions or appears profoundly unjust at the forum, the law should not be applied. The principle can be defended on the ground that, above all, any court's job is to aim at the just accommodation of controversy or, perhaps, with the notion that the decisions of courts should not "exhibit to the citizens of the state an example pernicious and detestable." Yet such cases, between countries of the civilized world and certainly between the states, will be few indeed. Perhaps the public policy idea can be used to achieve justice in a particular case if the strictest limitations are observed. [*Id.* at 1015–16 (footnote omitted).]

A decision in this case does not require that the standard be further refined because the policy underlying § 5–305 does not approach the required degree of substantiality. Indeed, as explained in part (4), *infra,* statutes invalidating certain promises to indemnify should, in my view, be treated as local economic regulation.

(4)

Three American courts have faced conflict of laws issues involving a forum state's statute invalidating certain indemnification promises. Two of the decisions indicate that the underlying policy of the statutes is not fundamental in the conflicts sense.

Ill.Rev.Stat. ch. 29, par. 61 (Supp.1985) was involved in *Champagnie v. W.E. O'Neil Construction Co.*, 77 Ill. App.3d 136, 32 Ill.Dec. 609, 395 N.E.2d 990 (1979). The employee of a subcontractor was injured on a construction job. He sued the general contractor who impleaded the employer on a contractual indemnity claim. Under the Illinois statute indemnifications against the indemnitee's own negligence in construction contracts were " 'void as against public policy and wholly unenforceable.' " 32 Ill. Dec. at 611, 395 N.E.2d at 992. In Wisconsin where the subcontract was made, the indemnification was valid. Initially addressing whether Wisconsin substantive law controlled or whether Illinois public policy barred the third-party claim, the court said that it "should not refuse to apply the law of a foreign state, however unlike its own, unless [the foreign law] is contrary to pure morals or abstract justice, or unless the enforcement would be of evil example and harmful to its own people." *Id.*, 32 Ill.Dec. at 610, 395 N.E.2d at 992. The court referred to *Davis v. Commonwealth Edison Co.*, 61 Ill.2d 494, 336 N.E.2d 881 (1975), in which the Illinois Supreme Court had sustained the statute against a challenge on equal protection grounds and opined that its purpose was to protect workers in the construction industry from dangers associated with that work. The intermediate appellate court then recognized that the statutory prohibition was "not founded upon the theory that the concept of indemnity itself is contrary to Illinois policies, but rather on the theory that without such agreements other more important policy considerations might be enhanced." 32 Ill.Dec. at 614, 395 N.E.2d at 995.

The *Champagnie* court, however, veered away from a holding based on the foregoing analysis. Believing that the Illinois Supreme Court had adopted the most significant contacts test of the Restatement (Second) of Conflict of Laws § 188(1) (1971), the court held that Illinois law governed validity and the indemnification was void. Illinois was said to have the greater interest because the purpose of the statute was workers' safety, an Illinois resident had been injured, and the construction work was being performed in Illinois.

An analysis closer to the *lex loci* approach is found in *Jemco, Inc. v. United Parcel Service, Inc.*, 400 So.2d 499 (Fla.Dist.Ct.App.1981), *cert. denied,* 412 So.2d 466 (Fla. 1982). A statute, Fla.Stat.Ann. § 725.06 (West Supp.1985), declared certain indemnification provisions in construction contracts to be

"void and unenforceable unless:

"(1) The contract contains a monetary limitation on the extent of the indemnification and shall be a part of the project specifications or bid documents, if any, or

"(2) The person indemnified by the contract gives a specific consideration to the indemnitor for the indemnification that shall be provided for in his contract and section of the project specifications or bid documents, if any."
[400 So.2d at 500 n. 4.]

An employee of the contractor was injured on the job and sued the owner who impleaded the contractor for contractual indemnity. Owner and contractor had made their agreement in Connecticut. Although the indemnification provision did not expressly apply to the owner's own negligence, Connecticut law, contrary to the majority rule, construed the covenant to embrace loss due to the owner's fault. The Florida court concluded that there was no strong public policy in Florida which prevented applying Connecticut law. It reasoned that

[n]o Florida public policy bars a business entity from contracting to indemnify another for its wrongdoing. In-

deed, Florida law specifically authorizes such indemnity agreements, provided only that the intent to indemnify is clearly and unequivocally expressed .... We deem it far more important to protect the expectations of the parties who at arm's length entered into a contract than to refuse to enforce an indemnity provision that fails in Florida, not because it is inherently offensive, but because the magic words which would make the provision valid in this state were not used. [400 So.2d at 502 (citation omitted).] This holding relies heavily on the exceptions to the prohibition in the Florida statute. There are no similar exceptions in Maryland's § 5–305.

The Third District of the Court of Appeal of Florida applied its *Jemco* decision in honoring a valid New York indemnification which would not have been valid if made in Florida. *See Pfaudler Co. v. Sylvachem Corp.*, 400 So.2d 503 (Fla.Dist.Ct.App.), *cert. denied*, 407 So.2d 1106 (Fla. 1981).

The third court which has addressed a conflicts issue where the forum had a statute like § 5–305 is the Supreme Court of Ohio. *See Jarvis v. Ashland Oil, Inc.*, 17 Ohio St.3d 189, 478 N.E.2d 786 (1985). The contract in that case was made in Kentucky where promises to indemnify are valid. The contract provided that Kentucky law would govern. An Ohio resident had been injured in an accident which occurred in New York. The court held that Ohio did not have a materially greater interest in the contract than Kentucky, so that the contractual choice of law was not disturbed.

According to a compilation made in 1977, there were then twenty-seven states which had enacted legislation regulating various indemnification provisions. *See* Georgia Chapter, The Society of Chartered Property and Casualty Underwriters, *The Hold Harmless Agreement, A Management Guide to Evaluation and Control* (3d ed. 1977) (*Hold Harmless Agreements*). The first such statute apparently was enacted in Michigan in 1966, effective March 10, 1967.

It is similar to Maryland's act. *See* Mich.Comp.Laws Ann. § 691.991 (West 1968). This movement in state legislatures is said to be the result of the efforts of many interested groups. *See Hold Harmless Agreements, supra,* at 26. Courts in our sister states which have enacted these statutes have had occasion to consider their purpose in cases which do not present conflict of laws issues. These opinions vary.

The Supreme Court of Illinois in *Davis v. Commonwealth Edison Co., supra,* 336 N.E.2d 881, without the benefit of any cited legislative history, thought that the Illinois legislature might have concluded that the widespread practice in the construction industry of obtaining indemnification agreements had caused those responsible for safety at a construction site to become lax. This analysis does not apply in Maryland. Invalidating certain indemnity agreements in the construction industry would seem to have been a very indirect way of accomplishing job safety when Courts Article § 5–305 was enacted in 1974. That was one year *after* the enactment by Ch. 59 of the Acts of 1973 of the Maryland Occupational Safety and Health Act, Md.Code (1957, 1985 Repl.Vol.), Art. 89, §§ 28–49D. Further, it is difficult to accept the theory that one who is responsible for construction site safety would adopt a devil-may-care attitude in reliance on a contractual indemnification obtained from someone else associated with the job when the contractual indemnification is only as good as the financial strength of the indemnitor, particularly if the indemnitor is uninsured or underinsured for the risk.

The Court of Appeals of Indiana has viewed that state's statute as " 'an effort to protect construction contractors against the pernicious effects of these clauses ....' " *Fort Wayne Cablevision v. Indiana & Michigan Electric Co.,* 443 N.E.2d 863, 869 (Ind.App.1983) (quoting Bepko, *Contracts and Commercial Law,* 1975 Survey of Indiana Law, 9 Ind.L.Rev. 132, 137). The pernicious effect referred to was said to arise where the general contractor negligently injures a subcontractor's employee; the employee sues the

general contractor who in turn claims contractual indemnification from the subcontractor. " 'Being thus forced into the role of an insurer can have a pernicious effect on the promisor, especially if the promisor's business insurance does not cover contract liability.' " 443 N.E.2d at 869–70. The situation envisioned by the Indiana court could not have influenced the Maryland General Assembly because here a general contractor is a statutory employer of the employees of subcontractors. *See* Md.Code (1957, 1985 Repl.Vol.), Art. 101, § 62. Of course, the Indiana analysis would apply in Maryland to claims by a subcontractor's employee against the owner who then, but for § 5–305, might claim contractual indemnification from the contractor.

I believe the New York courts have correctly analyzed the purpose of this type of statute. Relying on a memorandum of a member of the New York Assembly which was published in a legislative history service, the court in *County of Onondaga v. Penetryn Systems, Inc.*, 84 A.D.2d 934, 934, 446 N.Y.S.2d 693, 694 (1981), *aff'd*, 56 N.Y.2d 726, 451 N.Y.S.2d 738, 436 N.E.2d 1340 (1982) said that the New York statute

> was enacted in 1975 to prevent a practice prevalent in the construction industry of requiring contractors and subcontractors to assume liability by contract for the negligence of others. The Legislature believed that such "coercive" bidding requirements restricted the number of contractors able to obtain or afford the necessary liability insurance, thereby restricting the number of available bidders, that it unfairly imposed liability on a contractor or subcontractor for the fault of others over whom it had no control and that it unnecessarily raised the costs of construction since the cost of the insurance was added to the bid price . . . .

The New York Court of Appeals agreed in *Quevedo v. City of New York*, 56 N.Y.2d 150, 155–56, 451 N.Y.S.2d 651, 653, 436 N.E.2d 1253, 1255 (1982). There the court cited the same legislative history relied upon by the Appellate Division and concluded that

the Legislature sought to prevent the practice of requiring contractors or subcontractors to assume liability for the negligence of others, thereby increasing their insurance costs and thus the costs of construction ....

The New York analysis of the purpose behind statutes like Courts Article § 5–305 is also consistent with the history of the legislative movement for enactment of these statutes. As described in *Hold Harmless Agreements, supra,* 62–64, the American Institute of Architects in 1966 modified its boiler plate *General Conditions of the Contract of Construction* to add an indemnification by general contractors of architects which was aimed primarily at claims against architects by employees of contractors. "[T]he reaction of state chapters [of Associated General Contractors] was loud and immediate" and "[t]he fears of the contractors were shared by most of the major casualty insurers, who took a strong stand opposing the new AIA indemnification clause and stated or implied their unwillingness to insure the contract." *Id.* at 63.

It is clear, however, that contractual liability insurance is and, prior to enactment of Courts Article § 5–305, was available to cover the indemnitor's risk. *See Hold Harmless Agreements, supra,* at 119ff. and the 1968 edition of the same work at 71ff. Indeed, counsel for both parties at oral argument of this case agreed that the exposure under the contractual indemnification clause was insurable.

Section 5–305 voids only indemnifications against loss due to the indemnitee's sole negligence in the construction industry setting. Use of such indemnifications in other business relationships is not prohibited. In other words, indemnification against the indemnitee's sole negligence is not *inherently* contrary to Maryland public policy. Nor does the Maryland prohibition apply if indemnitor and indemnitee are concurrently negligent. Under the latter circumstance an agreement properly may shift onto the indemnitor the total cost of the common liability to the injured party. *See Scarborough v. Ridgeway,* 726 F.2d 132 (4th Cir.1984);

*Mason v. Callas Contractors, Inc.,* 494 F.Supp. 782 (D.Md. 1980), both interpreting § 5–305. Moreover, if the otherwise proscribed indemnification is promised by an insurer, it is valid.

This exception for insurance policies in § 5–305 means that one party to a construction contract could be the promisee of a covenant by a second party that the second party would obtain and pay the premium on insurance covering the promisee for liability arising from the promisee's *sole* negligence. *Zettel v. Paschen Contractors, Inc.,* 100 Ill.App.3d 614, 56 Ill.Dec. 109, 427 N.E.2d 189 (1981) held that such an arrangement did not violate the Illinois statute voiding certain indemnifications. That court did not consider a promise to obtain insurance to be the same as a promise directly to indemnify. There does not seem to be so great a difference, that fundamental Maryland public policy in the conflict of laws sense becomes implicated, between (1) Zarnas' promising at its expense to obtain liability insurance covering Bethlehem and (2) Zarnas' purchasing contractual liability insurance for itself after having promised to indemnify Bethlehem against the latter's sole negligence. Indeed, the Supreme Court of Pennsylvania has observed that covenants to indemnify one against one's own negligence "are useful to parties involved in construction and similar activities as a means of allocating the responsibility for obtaining insurance ...." *Westinghouse Electric Co. v. Murphy, Inc., supra,* 425 Pa. at 173 n. 5, 228 A.2d at 660 n. 5. *See generally* Curtis, *Third-Party Indemnity and Coverage,* 1965 Ins.L.J. 594; Maurer, *Architects, Engineers and Hold Harmless Clauses,* 1976 Ins.L.J. 725; Morrison, *Contractual Liability Coverage— Some Practical Aspects of Hold Harmless Agreements and Contracts of Indemnity,* 25 Ins.Coun.J. 198 (1958).

In sum, the effect of § 5–305 is to eliminate for parties making construction contracts in Maryland exposure on a contractual indemnification against loss due to the indemnitee's sole negligence. Nevertheless, a prudent Maryland contractor still has to obtain contractual liability insurance

against the *total* exposure of a liability caused by the indemnitee's and the contractor's concurrent negligence if the contractor is unable to negotiate out of the contract a clause calling for that indemnification. While § 5–305 may afford Maryland contractors some economic relief, economic tinkering is not the stuff of which fundamental social policy is made. Section 5–305 does not, in my opinion, represent so strong a Maryland public policy as to require applying the statute to void the indemnification provision of the Bethlehem-Zarnas contract. I would reverse.

Chief Judge MURPHY has authorized me to state that he concurs with the views expressed herein.