Roy W. HELM, III, Plaintiff,

v.

WESTERN MARYLAND RAILWAY COMPANY, a body corporate, Defendant–Appellant,

v.

The COUNTY COMMISSIONERS OF CARROLL COUNTY, Third Party Defendant–Appellee.

No. 87–1088.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 2, 1987.

Decided Feb. 3, 1988.

Ransom J. Davis (H. Russell Smouse, Kenneth D. Pack; Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A., John P. Higinbothom, Baltimore, Md., on brief), for defendant-appellant.

Lee Baylin (George A. Nilson, Piper & Marbury, Baltimore, Md., Charles W. Thompson, Jr., Westminster, Md., on brief); for third party defendant-appellee.

Before MURNAGHAN and ERVIN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

MURNAGHAN, Circuit Judge:

Having settled the claim of its injured employee, and upon losing in the district court on summary judgment, the Western Maryland Railway Company ("Railroad") comes to this Court seeking reimbursement through the enforcement of the indemnity clause in a contract granting Carroll County, Maryland the privilege of constructing a box culvert on part of the Railroad's right of way. The district court found the indemnity agreement void under a Maryland statute barring the enforcement of agreements in or relating to construction contracts that purport to indemnify a promisee for injuries resulting from the promisee's sole negligence. *See* Md.Cts. & Jud.Proc. Code Ann. § 5–305 (1984). The question on appeal is whether the district court correctly found that § 5–305 applies to the licensing agreement between the Railroad and the County, and if so whether the district court correctly found that there was no genuine issue of material fact and that the Railroad was solely negligent.

In 1980, there was severe flooding outside Westminster, Maryland, where Hahn Road crosses a right-of-way owned by the Railroad. Hurricane Agnes had previously washed out the tracks; the Railroad had abandoned that section of tract instead of repairing it. In 1980, the Mayor of Westminster began to negotiate with the Railroad to obtain rights to enter the Railroad's right-of-way in order to improve drainage in the area; because the site was outside the city, Carroll County took over the negotiations. Carroll County wanted to put a box culvert under Hahn Road, and needed to have some railroad track and line poles removed.

On August 1, 1982, Carroll County executed the Railroad's standard license agreement; the agreement was sent to the Railroad, with the required $400 payment to defray the Railroad's costs, on October 5, 1982. The Railroad refused to waive the fee because it found it would receive "little, if any, benefit" from the project. Under the agreement, the County also agreed to reimburse the Railroad for any expenses incurred in performing any work related to the County's project, including labor, materials, supervision, and employee-related taxes.

The license agreement contained an indemnity clause under which the Licensee (Carroll County) agreed to indemnify the Licensor (Railroad) against all loss and damage to any property and "on account of injury to or death of any person whomsoever (including employees and patrons of the parties hereto and all other persons whomsoever)," and

all claims and liability for such loss and damage and cost and expenses thereof, caused by or growing out of the operation of this agreement or the presence, construction, maintenance, use, repair, change or relocation and subsequent removal of said facilities, or any part thereof, whether caused by the fault, failure or negligence of Licensor or otherwise.

The agreement also provided that the Railroad's approval or supervision of work or its failure to object to any work done was not to be construed as an admission of responsibility or a waiver of the County's obligations.

In early October, 1982, construction of the box culvert began pursuant to an agreement between Carroll County and the Hanover Construction Company ("Hanover"). That agreement included provisos that the Railroad (which was not a party) was to remove tracks and ties, and remove or relocate signal poles and other items "within the project limits as shown on the plans, or as directed by the engineer, at no cost to the contractor." The agreement also specified, "the railroad requires at least ten (10) days notice prior to beginning their work on this project. It will be the Contractor's responsibility to notify the railroad and coordinate his work with that of the railroad."

On October 25, 1982, Hanover's project engineer discussed the need to remove tracks, ties and signal poles from the work area with a Railroad official. The conver-

sation was followed up by two letters asking the Railroad to do its work, on November 24 and December 13. In the first letter, Hanover asked to be called to coordinate the work. In the second letter, Hanover notified the Railroad that it had temporarily stopped work on the project because the Railroad's equipment had not yet been removed, again asking to be notified when the Railroad intended to start work.

On January 13, 1983, the Railroad sent a signal and maintenance crew (including Roy Helm, whose suit for injuries sustained was a prelude to the present litigation) to remove poles carrying signal lines from the worksite. The Railroad did not inform Hanover. No Hanover employee was present, but the County's project engineer was there and encountered two Railroad employees at 8:45 a.m. The County engineer offered to show them plans of the work and discuss the project, but his offer was refused. The County engineer also testified that he informed the employees they were working on a pole *outside* the work area. The workers did not have plans of the project, but there was a stake in the ground marking the boundary of the project site.

Roy Helm was severely injured when the utility pole he was working on (tying off wires) broke and fell on top of him. The pole he was on was outside the designated work area. The Railroad argued below that Helm's presence on that pole was necessary to do the County's work because the lines had to be tied off once the poles were removed from the work area.

Roy Helm filed suit in federal district court against the Railroad under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60. Helm later settled his claim with the Railroad, and thus is not now a party to the appeal. The Railroad joined the County as a third-party defendant on the strength of the indemnity clause in the license agreement. The district court granted the County's motion for sum-

mary judgment on the third party claim, finding that the indemnity agreement was void and unenforceable under Maryland law. The district judge ruled that § 5–305 of the Courts and Judicial Proceedings portion of the Maryland Code, barring certain indemnity agreements associated with construction, applied to the indemnity provision at issue; he then found there was no genuine issue of material fact regarding negligence, and that the Railroad was solely negligent, so the indemnity agreement was rendered void by § 5–305.[1] The Railroad has appealed the grant of summary judgment.

### I.

On appeal, the Railroad argues that § 5–305 does not apply to railroad licenses, relying on a recent decision of this Circuit that was handed down after the district court's decision. *See Brown v. Baltimore & Ohio Railroad,* 805 F.2d 1133 (4th Cir. 1986). While the Fourth Circuit panel found that § 5–305 did not apply to the railroad license agreement in *Brown,* we do not find *Brown* controlling here.

Section 5–305 prohibits agreements "in, or in connection with or collateral to, a contract or agreement relating to the construction, alteration, repair, or maintenance of a building, structure, appurtenance or appliance, including moving, demolition and excavating connected with it" that indemnify the promisee for damages resulting from the promisee's sole negligence. Md. Cts. & Jud.Proc. Code Ann. § 5–305 (1984). The statute specifies that such an agreement "is against public policy and is void and unenforceable." *Id.* On the strength of that phrase, the Maryland Court of Appeals has applied the statute to bar enforcement of an indemnity clause contained in a construction contract executed in Pennsylvania. *Bethlehem Steel Corp. v. G.C. Zarnas & Co.,* 304 Md. 183, 498 A.2d 605 (1985).

---

1. The County had also argued for summary judgment on the ground that the plaintiff was not doing any work for the benefit of the County at the time of the accident, because he was outside the work area; the district court found there was a genuine dispute of material fact as to that contention.

The key issue is whether the railroad licensing agreement here constitutes a construction agreement covered by § 5–305. In *Brown v. Baltimore & Ohio Railroad,* 805 F.2d 1133 (4th Cir.1986), this Court found that the statute did not apply to the railroad licensing agreement at issue. The facts in *Brown* are initially similar to those in the instant case. In *Brown,* the railroad agreed to allow Baltimore County to install a sewer line beneath its railroad tracks, and executed an agreement permitting the county to install, operate and maintain sewer pipe in a particular area. The county paid $500 for the agreement, which provided that the county would indemnify the railroad against any loss or liability arising out of or connected with the sewer crossing project, regardless of whether the loss was caused by the railroad's negligence. *Id.* at 1135–36. Baltimore County contracted with a construction firm to do the work. A big earthmover owned by that construction firm was put on the tracks by unknown third persons, and a railroad employee was injured when the train he was riding hit the earthmover. The injured employee sued the railroad under the FELA, and the railroad asserted a third-party claim against the county based on the indemnity clause in the license agreement. Considering the applicability of § 5–305, the Fourth Circuit panel held that "the statute was not intended to apply to licensors or easement grantors such as the B & O who enter into railroad crossing indemnity agreements of this type." *Id.* at 1141. Instead, the Court found, "[t]he obvious core purpose of the statute is to prohibit the parties to construction contracts—owners of property and their prime and sub-contractors—from avoiding by indemnity agreements all risks created by their own fault associated with contract performance." *Id.* at 1142. The court went on to stress that the railroad had simply granted an easement and was *not* "in a position to control performance" of the construction contract. *Id.* The Fourth Circuit panel also noted, however,

> We need not and do not decide that the statute is aimed only at the direct parties to construction contracts as would-be indemnitees. The point is merely that

these are the statute's most obvious objects and that the intended reach of the statute can therefore best be gauged by assessing the extent to which risk-shifting efforts by others raise the same concerns that obviously attend such efforts by parties to construction contracts.

*Id.* at 1142 n. 5.

The footnote guides our analysis in the present case. In *Brown,* the indemnitee had no role in the construction activities, so it was logical to find § 5–305 inapplicable; this case presents a closer question. This Court could properly conclude that where the indemnitee is supposed to carry out specific construction work under the contract, the attempt at risk-shifting is prohibited by § 5–305. The question boils down to a tension between two possible policy goals: Maryland's expressed policy of making actors engaged in construction work responsible for their own negligence, and the policy stressed in *Brown* of continuing the railroads' traditional power to secure indemnity agreements so they will be willing to grant licenses or right-of-way easements.

To reconcile *Brown* and the present case it is merely necessary to appreciate that, while both cases involved contracts granting permission to engage in construction on a railroad's right-of-way, in *Brown* the railroad was not engaged in any construction work pursuant to the contract while in the present case the Railroad was engaged in construction work pursuant to (although not required by) the contract when the injury occurred. Thus, only in the present case is it necessary to apply Maryland's expressed public policy against requiring indemnification for one's own negligence in performing construction-related work contracted for by the indemnitor.

In the Maryland Court of Appeals' *Bethlehem Steel* case, the dissenting opinion (arguing that the policy expressed in § 5–305 was not strong enough to override the *lex loci contractus* principle and void a provision in a Pennsylvania contract) included a lengthy discussion of the underlying purposes of the Maryland statute and similar statutes in other states. Judge Ro-

dowsky argued in dissent that because § 5–305 only applies to construction contracts, it is apparent that "indemnification against the indemnitee's sole negligence is not *inherently* contrary to Maryland public policy." 498 A.2d at 620 (Rodowsky, J., with Murphy, C.J., dissenting) (emphasis in original). The statutes were instead enacted, he argued,

> "to prevent a practice prevalent in the construction industry of requiring contractors and subcontractors to assume liability by contract for the negligence of others. The Legislature believed that such 'coercive' bidding requirements ... unfairly imposed liability on a contractor or subcontractor for the fault of others over whom it had no control and that it unnecessarily raised the costs of construction...."

*Id.* (quoting *County of Onondaga v. Penetryn Systems, Inc.,* 84 A.D.2d 934, 934, 446 N.Y.S.2d 693, 694 (1981), *aff'd,* 56 N.Y.2d 726, 436 N.E.2d 1340, 451 N.Y.S.2d 738 (1982)). The language in the Maryland statute is very broad, and we find no indication that the General Assembly tried or intended to limit § 5–305's reach to contractors and subcontractors specializing in construction. Under the criteria put forward by Judge Rodowsky, assuming that the Railroad was solely negligent, the agreement in this case falls afoul of § 5–305. The indemnity clause was coercively obtained, as the Railroad, occupying the place in question, refused to accept anything other than its standard license agreement. Adding liability for the Railroad's negligence in its construction activities raises the prospective cost for the government entity desiring to install a drainage project across the right-of-way. The indemnity agreement here would unfairly impose liability on the County for the fault of Railroad workers over whom it and its contractor had no control.

The Fourth Circuit panel in *Brown* stressed that railroads had a long-standing practice of requiring indemnity as part of licenses or grants of easements; but it appears that the court had in mind situations like the one then before it, where the railroad was not actively involved in construction work:

> To construe this statute as curtailing railroads' traditional power to bargain in good faith for indemnity from their licensees or grantees whenever construction work *by the grantee or licensee* on the right of way is contemplated would therefore have serious public policy implications. We are satisfied that the legislature was necessarily aware of these and that the statute must be construed with this in mind.

*Brown,* 805 F.2d at 1142 (emphasis added). By contrast, here the Railroad was not a passive licensor. Here, the Railroad expressly contracted to do construction work, for which it was directly reimbursed by the County. The parties have not so argued, but it might be most appropriate to view this arrangement as a license to work on the Railroad's right of way *plus* a contract (with cost-based reimbursement) for specialized construction services provided by the Railroad and associated with the project.

▪ Section 5–305 does not expressly exempt railroads, or agreements related to grants of right-of-way by railroads, or agreements benefiting only the indemnitor; it only expressly exempts insurance contracts. Md.Cts. & Jud.Proc. Code Ann. § 5–305 (1984) ("[t]his section does not affect the validity of any insurance contract"). The Railroad does not argue here that it was buying insurance from the County, and in any event the parties did not comply with the numerous Maryland laws and regulations governing insurance agreements.[2] As the licensing agreement

---

2. Maryland law specifically provides that "[n]o person shall engage in or transact an insurance business in Maryland, or act relative to a subject of insurance resident, located or to be performed in Maryland, without complying with the applicable provisions of this article." Md. Ann. Code of 1957, art. 48A, § 1 (1986). "Insur-

ance" is defined as "a contract whereby one undertakes to indemnify another or pay or provide a specified or determinable amount or benefit upon determinable contingencies." *Id.* § 2. Authorized insurers are closely regulated by the State. *See, e.g., id.* § 42 (certificate of authority required); § 44 (insurer must be incorporated

falls squarely within the statute's terms, and coverage is consistent with the apparent legislative intent in enacting the statute, we conclude that this Court should not second-guess the legislature's action by exempting the construction agreement involved in the present case.

## II.

Once we have determined that § 5–305 applies to the licensing agreement here at hand, the next question is whether the statute bars indemnification for this accident. By its terms, § 5–305 bars indemnification only where the indemnitee is solely negligent. The Maryland courts have not yet spoken clearly on the subject, but it appears that § 5–305 does not bar indemnification where both the indemnitee and the indemnor are negligent. *See Brown v. Baltimore & Ohio Railroad,* 805 F.2d 1133, 1141 n. 4 (4th Cir.1986) (Maryland's highest court has "assume[d], without deciding, that the statute does not proscribe indemnification for liability resulting from 'concurrent' as opposed to 'sole' fault") (citing *Bethlehem Steel Corp. v. G.C. Zarnas & Co.,* 304 Md. 183, 498 A.2d 605 (App. 1985)); *Scarborough v. Ridgeway,* 726 F.2d 132, 136 (4th Cir.1984) (because death resulted from joint negligence, the indemnification was beyond the proscription of the statute). When he granted summary judgment below, the district judge found that indemnification was barred by § 5–305 because the Railroad was *solely* negligent: "Western Maryland [Railway Company] has not come forward with any facts to show that the County was negligent and, in light of the nature of the accident involved, Western Maryland's assertion of alleged

negligence by the County is simply conjectural."

■ Rule 56 provides that summary judgment shall be rendered only if "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). An appellate court reviewing the grant or denial of a summary judgment motion applies the same standard as the trial court. 10 Wright, Miller & Kane, *Federal Practice and Procedure* § 2716 (1983). The appellate court, therefore, must reverse the grant of summary judgment if it appears from the record that there is an unresolved issue of material fact; the inferences to be drawn from the underlying facts contained in the materials before the trial court must be viewed in the light most favorable to the party opposing the motion. *Id.; Smith v. University of North Carolina,* 632 F.2d 316, 338 (4th Cir.1980).

■ Here, the Railroad made two arguments that it was not solely negligent: (1) the County and/or Hanover was negligent in not providing the Railroad with sufficient plans or direction for the Railroad's work; and (2) the injured worker was also negligent (he could still recover under the FELA's comparative negligence provisions).[3] We find the Railroad's arguments unpersuasive. The facts show that Hanover Construction contacted the Railroad three times asking that tracks, poles and other things be removed, and asking the Railroad to contact Hanover to coordinate that work. On the day of the accident, a County engineer encountered Railroad employees at the worksite and offered to show them plans of the project. At no time did the Railroad avail itself of the offers. The facts are uncontested by the

---

stock, incorporated mutual, or reciprocal insurer); §§ 47–49 (capital and surplus requirements specified); § 58 (annual and interim statements required); § 72 (risk retained on any one subject of insurance limited to 10%); §§ 97–107 (investment portfolios of insurers regulated); §§ 212–240H (unfair trade practices prohibited). In addition to this strict regulation of the activities of authorized insurers, with some exceptions not pertinent here, in Maryland "any contract of insurance effective in this State and entered into by an unauthorized insurer is unenforceable by such insurer." *Id.* § 207.

**3.** The Railroad also argues in its brief to this Court that there is a material factual dispute about the map submitted by the County, where the pole on which Helm was injured is marked "cut off." This argument is nonsensical because the Railroad did not rely on that map when it sent Helm out; the record below contains uncontradicted testimony that the "cut off" notation was added after the accident.

Railroad except for broad assertions that the County and/or Hanover breached "a duty to provide further direction, coordination or information to the Railroad." The Railroad also did not present any facts tending to show that the injured worker was negligent. Under Rule 56(e), "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading;" his response "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Here, the Railroad has not presented evidence to support its arguments that others were negligent. The district court's grant of summary judgment is, therefore,

AFFIRMED.

BUTZNER, Senior Circuit Judge, dissenting:

In *Brown v. Baltimore & Ohio Railroad Co.,* 805 F.2d 1133 (4th Cir.1986), this court upheld the validity of an indemnity clause contained in a railroad licensing agreement similar to the one involved in this case. We upheld the indemnity agreement in *Brown* because we concluded that Md.Cts. & Jud. Prac. Code Ann. § 5–305 did not vitiate indemnity provisions in railroad licensing agreements. *Brown,* 805 F.2d at 1141–42. Yet today the court holds that the statute invalidates the indemnity provision contained in this railroad licensing agreement.

This case appears indistinguishable from *Brown.* In each case the county sought the license from the railroad—in *Brown* for the purpose of installing a sewer line, and here for the purpose of installing a box culvert. In each case the license was granted as an accommodation to the county in exchange for a small fee—$500 in *Brown,* $400 in this case. In each case the harm to the railroad employee was caused by the railroad's negligence—not by any negligence of the counties and their contractors. It is true that the facts establishing negligence in *Brown* differ from the facts in this case. In *Brown,* a railroad engineer failed to stop his train before it struck some construction equipment, injuring the brakeman. In this case, the railroad sent an employee to perform work for the benefit of the county and the city on an unsafe utility pole. In both instances the railroads failed to provide their employees a safe place to work. Upon analysis, the distinction between the cases is simply one without a difference as far as § 5–305 is concerned. The statute makes no distinction based on the particulars or the nature of the indemnitee's fault. I therefore see no justification for distinguishing this case from *Brown.*

Such a case-by-case determination of the validity of indemnity clauses in railroad licensing agreements has unfortunate consequences. Parties to these agreements will have no way to know whether indemnification is available until after an accident occurs and liability is assessed. Where bright-line rules currently exist, courts should hesitate to place parties in such a quandary.