935 F.2d 267
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
COKER INTERNATIONAL, INCORPORATED, Plaintiff-Appellant,
v.
BURLINGTON INDUSTRIES, INC., Defendant-Appellee.
 No. 90-2494.
 United States Court of Appeals, Fourth Circuit.
 Submitted May 22, 1991.
Decided June 11, 1991.
As Amended June 21, 1991.
 
 Appeal from the United States District Court for the District of South Carolina, at Greenville. Joe F. Anderson, Jr., District Judge. (CA-90-734-6-17)
 H.W. Pat Paschal, Greenville, S.C., for appellant.
 Jack H. Tedards, Jr., Leatherwood, Walker, Todd & Mann, P.C., Greenville, S.C., for appellee.
 D.S.C., 747 F.Supp. 1168.
 AFFIRMED.
 Before WIDENER, K.K. HALL, and SPROUSE, Circuit Judges.
 PER CURIAM:
 
 
 1
 Coker International, Inc. ("Coker") is seeking rescission of its contract for the purchase of used textile looms from Burlington Industries, Inc. ("Burlington"), and the return of a "non-refundable downpayment." The district court granted Burlington's motion for summary judgment as to each of Coker's causes of action. We granted a joint motion to submit this case for decision on the briefs, without oral argument. Upon consideration of the briefs and joint appendix, we affirm the district court's order.
 
 I. STANDARD OF REVIEW
 
 2
 In reviewing the district court's order granting summary judgment, we must apply the same standard as the trial court. Helm v. Western Md. Ry. Co., 838 F.2d 729, 734 (4th Cir.1988). Upon a motion for summary judgment, the court must view the facts, and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. Ross v. Communications Satellite Corp., 759 F.2d 355 (4th Cir.1985). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). However "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).
 
 II. FACTS
 
 3
 Sometime around December 21, 1987, Coker entered a contract with Burlington whereby it agreed to purchase 221 used textile looms as well as loom beams, remaining harness frames, and assorted loom parts, a stainless steel size pump, and two cloth doffing trucks. The total purchase price for these items was to be $1,021,000. The terms of the sale were as follows:
 
 
 4
 10% NON-REFUNDABLE DOWNPAYMENT TO BE RECEIVED BY CLOSE OF BUSINESS ON JANUARY 8, 1988. IF NOT RECEIVED, BURLINGTON MAY, AT ITS OPTION CANCEL [THE CONTRACT] AND OFFER THE LOOMS FOR SALE TO OTHERS.
 
 
 5
 BALANCE TO BE PAID PRIOR TO REMOVAL OF LOOMS. REMOVAL TO BE COMPLETED BY MARCH 1, 1988.
 
 
 6
 SOLD "AS IS, WHERE IS MILL FLOOR"
 
 
 7
 The sale was also subject to other terms and conditions attached to the contract. Relevant to this lawsuit is the force majeure provision. This paragraph states:
 
 
 8
 Deliveries may be suspended by either party in case of act of God, war, riots, fire, explosion, flood, strike, lockout, injunction, inability to obtain fuel, power, raw materials, labor, containers, or transportation facilities, accident, breakage of machinery or apparatus, national defense requirements or any cause beyond the control of such party, preventing the manufacture, shipment, acceptance, or consumption of a shipment of the Goods or of a material upon which the manufacturer of the Goods is dependent.
 
 
 9
 Coker informed Burlington that it intended to resell the looms. In response to Burlington's standard inquiry regarding whether its products would be resold to possible competitors, Coker stated its intent to resell the equipment to customers in Peru.[1] The contract was silent as to the existence of potential purchasers or contracts for sale to third parties by Coker.
 
 
 10
 Coker paid the required down payment, albeit ten days late. None of the looms were picked up or paid for by the deadline required by the contract, March 1, 1988. Several extensions of time were granted by Burlington in order for Coker to obtain financing and remove the equipment. By April 11, Coker had paid $166,800 against the total invoice of $1,021,000 and had removed only 16 looms.
 
 
 11
 After extensive discussion and correspondence between the parties, they entered into a supplemental letter agreement in yet another attempt on Burlington's part to accomodate Coker.[2] Under the agreement, Burlington agreed to sell Coker the remaining looms and give Coker credit for the non-refundable down payment on the same terms as in the original contract, provided that the balance due was to be paid in full by May 31, 1988. The agreement further provided that Coker would pay in advance for all looms picked up between May 4 and May 31, 1988. The final deadline for removal was to be June 10, 1988. Finally, Burlington would be entitled to place all looms not paid for by May 31, 1988, back on the open market.
 
 
 12
 By letter dated May 27, 1988, Coker informed Burlington that it had removed 12 looms. It further informed Burlington that payment and removal of the remainder of the looms would take place by June 30, 1988. The letter indicated that Coker had received a commitment from a buyer in San Fernando, S.A., and was awaiting the necessary license to import, and a letter of credit which was expected to follow. Burlington agreed to the extension to June 30, but warned Coker that it would be the last. It also informed Coker that it would be charged for storage. By July 6, 1988, the payment had not been received by Burlington. Burlington declared its intent to treat the original agreement as breached and to put the looms back on the open market. At that time, Coker had taken delivery of 34 of the looms and paid a total of $239,750.
 
 
 13
 By letter dated November 17, 1988, Coker wrote to Burlington to demand a solution which would give Coker credit or refund for the down payment. Coker also referred to the force majeure provision of the contract and stated that its customer in Peru could not accept delivery for reasons beyond Coker's control, and argued that it was therefore entitled to a refund of the down payment.
 
 III. LEGAL DISCUSSION
 
 14
 Coker presents three main arguments in support of its claim that the original contract should be rescinded: first, that there was frustration or impossibility of purpose; second, that the force majeure clause should take effect; and, third, that the provision for a non-refundable down payment was unconscionable. We find no genuine issue of material fact with regard to these contentions. Hence, the only issue on appeal is whether Burlington was entitled to judgment as a matter of law.
 
 
 15
 A. FRUSTRATION OF PURPOSE. The doctrine of frustration of purpose or impossibility discharges a party from its contractual obligations due to some supervening frustration.
 
 
 16
 Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or circumstances indicate the contrary.
 
 
 17
 Restatement (Second) of Contracts Sec. 265 (1979). Illustration 5 presents a situation remarkably like the one in this case: A contracts with B to sell machinery. A knows that B intends to resell the machinery in a different country. Before delivery to B, that country prohibits the import of the machinery. The Restatement concludes that "if B can reasonably make other disposition of the machine, even though at some loss, his principal purpose of putting the machines to commercial use is not substantially frustrated."
 
 
 18
 Coker argues that its contractual obligations should be discharged due to the intervening cancellation on all import licenses by the government of Peru. It further argues that it could not "reasonably make other disposition" since the type of used looms it agreed to purchase are only marketable in developing countries since they are very labor intensive and since more sophisticated, less labor intensive looms are available and in demand in places like the United States.
 
 
 19
 We find Coker's arguments unpersuasive. First, the language of the contract is to the contrary. It expressly states that the down payment is non-refundable and makes no provisions for allocating the risk other than to Coker with respect to it. There was no provision, either in the original contract or in the supplemental letter agreement, regarding Coker's resale plans. Coker could have made the contract contingent on its ability to resell the looms to the Peruvian buyer. Because it did not, Coker assumed the risk of resale when it entered into the contract. See Restatement (Second) of Contracts, Sec. 265, comment a ("The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract.").
 
 
 20
 Second, as Burlington points out, sales to developing countries are inherently risky, especially in Latin America and South America. It does not, therefore, appear that the nonoccurrence of political turbulence resulting in economic uncertainty for exporters would reasonably have been a basic assumption upon which the contract was based. Burlington would not have shared in any of Coker's profits had the sales to Peru gone through. Likewise, Burlington should not be required to share the loss when the sales failed.
 
 
 21
 Third, Coker's principle purpose for the contract, to resell the looms, has not been substantially frustrated. In Swift Canadian Co. v. Banet, 224 F.2d 36 (3d Cir.1955), a Canadian Corporation contracted to sell a number of lamb pelts to a Philadelphia company. Before delivery of the goods, the United States Bureau of Animal Industry passed certain regulations having the effect of prohibiting the import of the pelts. The court held that the buyer bore the risk of loss. This was so even though the contract explicitly stated that neither party would be liable for acts of governments. Id. at 38. Although one resale may have been frustrated, it was not necessarily impossible for the Philadelphia company to resell elsewhere. Likewise, the mere fact that Coker's Peruvian buyers were unable to purchase the looms did not prevent Coker from attempting to resell the looms elsewhere.
 
 
 22
 Finally, assuming that the doctrine of frustration of purpose applied to the facts in this case, the doctrine would only serve to discharge the remaining obligations of the parties to render performance. Therefore, even were we to conclude that Coker's purpose was frustrated, Coker would only be discharged from its obligation to purchase the remaining looms. Coker would not necessarily be entitled to a return of its down payment.
 
 
 23
 B. FORCE MAJEURE CLAUSE. Coker contends that the force majeure clause should apply, and that the clause entitled it to rescind the contract or recover the non-refundable down payment, since the actions of the Peruvian government prevented resale of the looms. We disagree.
 
 
 24
 First, we are not convinced that the clause should apply at all. By its terms, the clause allows deliveries to be suspended by either party for delineated causes preventing the manufacture, shipment, acceptance, or consumption of the goods. Coker's inability to consummate a contract for resale clearly does not affect its own ability to accept shipment. Again, subjective impossibility of performing is not a proper ground for rescission. Moon v. Jordan, 390 S.E.2d 488 (S.C.Ct.App.1990).
 
 
 25
 Furthermore, even were the force majeure clause to apply, its only effect would be to suspend deliveries. Nowhere does it insure the refund of an explicitly non-refundable down payment. We disagree with appellant that the contract provisions regarding the down payment and the force majeure clause are in conflict; nor are they susceptible to more than one interpretation, since they address two separate aspects of the contract. Hence, we conclude that summary judgment was proper on this issue.
 
 
 26
 C. UNCONSCIONABILITY. Coker's final argument in favor of rescission is that the non-refundable down payment provision was unconscionable. Specifically, Coker contends that Burlington knew it was in the business of reselling textile equipment to foreign customers. The 10% non-refundable down payment provision meant that Coker was forced to pay over $100,000 prior to its resale and "with his future resale hanging in the balance of the whims of an unstable South American government." (Appellant's brief at 9).
 
 
 27
 According to the South Carolina Code provisions pertaining to sales transactions, whether a contract provision is unconscionable is a matter of law to be determined by the court. S.C.Code Ann. Sec. 36-2-302. Furthermore, the circumstances of the case coupled with an inquiry into the principles of equity, oppression, and unfair surprise must be considered in determining whether "the clauses involved are so one-sided as to be unconscionable" at the time the contract was formed. Jones Leasing, Inc. v. Gene Phillips & Assoc., 282 S.C. 327, 331, 318 S.E.2d 31, 33 (Ct.App.1984).
 
 
 28
 The South Carolina Reporter's Comments to the Code warn against using the doctrine to level inequities felt by changes in market conditions between the time of the contract and the time of performance. See also S.C.Code Ann. Sec. 36-2-302, Comment 1 (doctrine not to be applied to alter the allocation of risk).
 
 
 29
 The mere fact that there were few suppliers to whom Coker could turn for the product does not establish the kind of unequal bargaining power required to declare the contract, or its provisions, unconscionable. Both parties are commercial corporations and can be expected to understand the straightforward nature of the non-refundable deposit term. The record shows in all respects that Coker was aware of the existence of the contract terms but nonetheless took the risk that the deposit money would be forfeited in the event that it became unable to perform according to the contract's terms.
 
 
 30
 Moreover, the allocation of risk was clear and bargained-for. In exchange for the non-refundable down payment, Burlington agreed to remove the looms from the market for over six months. During that time, it had to forego other opportunities to sell the looms. Burlington also lost the use of its plant space by having to store the looms beyond the date on which their removal had been scheduled.
 
 IV. CONCLUSION
 
 31
 For the reasons expressed, we conclude that there was no genuine issue of material fact and that Burlington was entitled to summary judgment as a matter of law.
 
 
 32
 AFFIRMED.
 
 
 
 [1]
 Burlington denies having had specific knowledge that Coker's buyers were in Peru but admits to knowledge that the buyers were somewhere in Mexico or South America
 
 
 [2]
 The supplemental agreement expressly reserved to Burlington any and all claims for damages it had against Coker for breach of the original contract