35 F.3d 557
 39 ERC 1458
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
SOUTHERN DREDGING COMPANY, INCORPORATED, Plaintiff-Appellee,
v.
UNITED STATES of America; John Channon, Acting Secretary of
the Army; Arthur E. Williams, Chief of Engineers; Robert
F. Unger, Major, U.S. Army Corps of Engineers; Carol M.
Browner, Administrator Environmental Protection Agency,
Defendants-Appellants.
 No. 93-2384.
 United States Court of Appeals, Fourth Circuit.
 Argued May 10, 1994.
Decided Sept. 13, 1994.
 
 Appeal from the United States District Court for the District of South Carolina, at Charleston. David C. Norton, District Judge. (CA-93-203-2-18)
 Martin William Matzen, United States Department of Justice, Washington, DC, for appellants.
 Michael Howard Payne, Starfield & Payne, P.C., Fort Washington, PA, for appellee.
 Lois J. Schiffer, Acting Asst. Atty. Gen., Anne S. Almy, Carl Strass, United States Department of Justice, Washington, DC; Jonathan S. Cole, Director, Contractor Listing Program, Environmental Protection Agency, Washington, DC, for appellants.
 Vincent O. Manuele, Starfield & Payne, P.C., Fort Washington, PA; Ralph E. Hoisington, Charleston, SC; W. Jefferson Leath, Jr., Stephen P. Groves, Sr., Young, Clement, Rivers & Tisdale, Charleston, SC, for appellee.
 D.S.C.
 VACATED AND REMANDED.
 Before ERVIN, Chief Judge, MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation, and ELLIS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Defendants appeal the order of the court below granting summary judgment in favor of Southern Dredging Company, Inc. ("Southern") on its motion to have the Environmental Protection Agency ("EPA") remove Southern's dredge vessel, the "Cherokee," from the List of Violating Facilities. The placement of the dredge on the list had the effect of precluding Southern from receiving federal contracts for jobs where it intended to use the Cherokee. Because we find necessary the resolution of certain issues not clearly addressed by the court below, we vacate the judgment of the court below and remand for further proceedings consistent herewith.
 
 I.
 
 2
 Southern owns the dredge Cherokee from which two former Southern employees dumped dredged material in February 1988 in violation of the Clean Water Act, 33 U.S.C. Sec. 1311(a).[1] In January 1991, Southern entered a "global settlement" with the Department of the Army for the purposes of settling all criminal, civil and administrative issues and of avoiding "protracted litigation."[2] Joint Appendix (JA) 23. Subsequently, Southern signed a plea agreement with the United States, JA 67, and pled guilty on February 19, 1991 to a one-count information for violating the Clean Water Act, 33 U.S.C. Sec. 1319(c). JA 74. Under the terms of the February 1991 plea agreement, Southern was to be placed on one year of probation and to be fined $100,000. JA 79. In consideration for Southern's plea, the United States "agree[d] that it [would] not seek to impose any additional criminal enforcement activities, against SOUTHERN DREDGING COMPANY, INC., arising out of any alleged violation of the Clean Water Act involving The Patriots Point Development Dredging Contract during February 1988." JA 80. The parties agreed that the plea agreement superseded "all prior promises, representations and statements of the parties, that this agreement may be modified only in writing signed by all parties; and that any and all other promises, representations and statements, whether made prior to or after this Agreement, are null and void." The agreement did not preclude governmental enforcement actions against any Southern employees. JA 69.
 
 
 3
 In May 1991, the EPA Office of Enforcement informed Southern that its Charleston, South Carolina headquarters had been automatically placed on the EPA's List of Violating Facilities as of February 1991, pursuant to section 508(a) of the Clean Water Act, codified at 33 U.S.C. Sec. 1368(a), and to 40 C.F.R. Sec. 15.10.[3] JA 74. The listing precluded Southern from obtaining any federal agency contracts until the EPA removed the company from the list upon satisfying itself that Southern had remedied the offending conditions. 40 C.F.R. Sec. 15.20. The court below subsequently vacated Southern's February 19 plea with the United States on August 7, 1991, and removed Southern from the list on the ground that the listing contradicted the terms of the plea agreement. Southern subsequently entered into a second plea agreement with the United States, as represented by United States Attorney E. Bart Daniel, under which Southern agreed to plead guilty to a one-count information for violations of the Rivers and Harbors Act, 33 U.S.C. Secs. 407 and 411. The plea agreement, dated January 21, 1992, provided essentially the same terms as the previous plea agreement entered into with the United States, with Southern agreeing to pay a $100,000 fine and the United States representing that it would not engage in further criminal enforcement activities against Southern arising out of the February 1988 dumping incident. JA 78.
 
 
 4
 Though Southern did not plead guilty to a Clean Water Act violation, and despite the plea agreement, the EPA's Office of Enforcement notified Southern that the Cherokee had been placed on the List of Violating Facilities pursuant to 40 C.F.R. Sec. 15.10 as of August 24, 1992, rendering the Cherokee ineligible for operation under federal contracts.[4] The listing was mandatory, according to the EPA, as a result of the Clean Water Act convictions of two former Southern employees, the captain and supervisor of the Cherokee, arising out of the February 1988 dumping incident.[5] JA 88. Subsequently, counsel for Southern contacted the EPA to request the removal of the Cherokee from the list. In its request, Southern contended that the Cherokee was not subject to the mandatory listing and that Southern had already taken remedial measures to ensure compliance with all environmental laws.[6] Southern's appellate efforts were largely unsuccessful, how ever, the EPA Assistant Administrator for Enforcement finding that Southern had not remedied the conditions giving rise to the Clean Water Act convictions.[7] JA 98, 101.
 
 
 5
 Southern subsequently filed its complaint in federal district court on February 3, 1993, seeking removal of the Cherokee from the list. The United States responded with a counterclaim requesting a declaratory judgment that the EPA had correctly placed the Cherokee on the list of facilities ineligible for government contracts. JA 32. On cross motions for summary judgment, the district court held that the Cherokee had been improperly placed on the List of Violating Facilities, since Southern had not been convicted of violating the Clean Water Act. JA 137. The district court noted that although the Cherokee did not cause or give rise to the illegal dumping by Southern's employees, JA 132, the EPA, purporting to act under its legislative authority, had nevertheless placed the Cherokee on the list following the employees' convictions. Interpreting section 508(a) of the Clean Water Act as requiring both a conviction of the person with whom the government desires to contract and the intention of the convicted person to perform the contract at the facility which gave rise to the conviction, the district court held that where Southern had not been convicted of any violation, it could not be precluded from using the Cherokee for federally contracted work. JA 136-37.
 
 
 6
 The district court also held inapplicable the enabling regulation, 40 C.F.R. Sec. 15.10, which provides for the mandatory listing of a facility, including a building or vessel,[8] if the "facility which gave rise to a conviction is owned, leased or supervised by any person who has been convicted" of violating the Clean Water Act. Because Southern had not been convicted of a Clean Water Act violation, the district court held that the listing of the Cherokee contravened the plain meaning of the regulation. JA 138-39. The district court acknowl edged that the EPA may, in its discretion under 40 C.F.R. Sec. 15.11 et seq., deny federal contracts to persons not convicted of offenses under the Clean Water Act if the performance of a contract would involve a facility which "gave rise" to a Clean Water Act conviction. JA 138. In that instance, however, the court noted that the discretionary listing procedures provide the individual with due process protections that the mandatory listing procedures do not, JA 139. The court intimated that the mandatory listing procedures, if applied to those not convicted of a crime under the Clean Water Act, tread on the minimum due process guarantee of the right to be heard. Consequently, the court granted Plaintiff's summary judgment motion on the mandatory listing of the Cherokee, and it is from this judgment that the Defendants appeal.
 
 II.
 
 7
 This court reviews de novo the grant of summary judgment below, Higgins v. E.I. Du Pont De Nemours & Co., 863 F.2d 1162, 1167 (4th Cir.1988), applying the same standard as the district court, Helm v. Western Maryland Ry. Co., 838 F.2d 729, 734 (4th Cir.1988) (citation omitted). When reviewing agency action, the court shall set aside such action where it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A). The reviewing court gives deference to the agency's interpretation of its own regulations, Clevepak Corp. v. EPA, 708 F.2d 137, 141 (4th Cir.1983) (citation omitted), as well as to an agency's interpretation of an ambiguous statute, Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984). If a statute is clear, however, the statute's plain meaning is conclusive, Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980), and "that is the end of the matter," Chevron, 467 U.S. at 842.
 
 
 8
 Both parties filed in the district court motions for summary judgment, asserting that there existed no genuine issues of material fact in dispute. The government argues on appeal that the district court erred in holding that the EPA lacked the statutory authority to place the Cherokee on the List of Violating Facilities.[9] The government suggests that section 508(a) of the Clean Water Act establishes merely the minimum enforcement measure which may be taken and does not specify the maximum punishment which may be imposed against a violator. The section provides in pertinent part:
 
 
 9
 No Federal agency may enter into any contract with any person, who has been convicted of any offense under section 309(c) of this Act, for the procurement of goods, materials and services if such contract is to be performed at any facility at which the violation which gave rise to such conviction occurred, and if such facility is owned, leased, or supervised by such person.
 
 
 10
 33 U.S.C. Sec. 1368(a). Defendants suggest that the statute and the legislative history[10] convey Congress' intention to grant EPA greater authority than determined by the court below.
 
 
 11
 In support of their assertion that Congress intended to grant EPA latitude under section 508, the Defendants point to section 508(c). The section provides, in pertinent part:
 
 
 12
 In order to implement the purposes and policy of this Act to protect and enhance the quality of the Nation's water, the President shall, not more than one hundred and eighty days after enactment of this Act, cause to be issued an order ... (2) setting forth procedures, sanctions, penalties, and such other provisions, as the President determines necessary to carry out such requirement.
 
 
 13
 33 U.S.C. Sec. 1368.[11] The Defendants argue that Congress, in enacting section 508(c), authorized a facility-based approach to proscribing federal contracting with violators that grants EPA authority above and beyond the listing powers in sections 508(a)-(b).[12] Accordingly, they urge enforcement of Executive Order 11738, 38 Fed.Reg. 25161 (September 12, 1973), issued by President Nixon pursuant to section 508, and the administrative regulations promulgated thereunder. The Executive Order provides that the EPA Administrator must designate facilities which have given rise to a Clean Water Act conviction, (section 2(b)), and must proscribe federal contracting with such facilities, (section 3(a)). Pursuant to the Executive Order, the EPA promulgated regulations listing such facilities. 40 C.F.R. Sec. 15.4. The EPA also promulgated regulations governing mandatory listings of facilities "g[iving] rise" to a conviction if "owned, leased, or supervised by any person who has been convicted" of a criminal violation under the Clean Water Act. 40 C.F.R. Sec. 15.10.
 
 
 14
 EPA argued strongly that its regulations should be enforced since they are within the scope of the Executive Order and do not conflict with statutory authority. The EPA failed to clearly address, however, how the language of its own regulation can be applied to Southern, considering that the company was not convicted under the Clean Water Act and its convicted employees no longer own, lease or operate the Cherokee.
 
 
 15
 The EPA addressed the effect of the contractual agreements between Southern and the Army and the United States in its reply brief. The agency first argued that the section 508 listing is not a criminal enforcement activity within the meaning of the plea agreement entered into between Southern and the United States Attorney. Next, the EPA argued that the agreement with the Army is not binding on the EPA, which was not a party to the global settlement.
 
 
 16
 On the other side, in addition to arguing that the EPA does not have the statutory authority to list the Cherokee, Plaintiffs urge the court to enforce the various agreements with the government which, they maintain, preclude the government from taking further civil, criminal or administrative enforcement actions against Southern for violations arising out of the 1988 dumping incident. For the reasons stated by the district court, we believe the Plaintiff's statutory arguments carry strong weight. Since we believe the case may be governed by the plea agreement entered into by Southern and the government, however, resolving the statutory question is unnecessary at this juncture.
 
 III.
 
 17
 Reading section 508(a) as a criminal enforcement provision, Southern insists that its plea agreement estops EPA, an agency of the government, from preventing Southern from using the Cherokee in the performance of government contracts. Southern argues that the plea agreement was breached when the EPA placed the Cherokee on the List of Violating Facilities because the United States Attorney has authority to bind all government agencies. Accordingly, Southern insists that the Cherokee should be removed from the list.
 
 
 18
 In addition, Southern maintains that the government must abide by the terms of the "global settlement" agreement through which the Department of the Army agreed not to impose further penalties, be they civil, criminal or administrative. Southern contends that it understood the administrative settlement agreement to bind not only the Department of the Army but any federal agency, asserting that the settlement was executed with the awareness and involvement of both the United States Attorney and the EPA. Plaintiff insists that even if the settlement agreement does not preclude all government agencies from pursuing additional sanctions against Southern, at the least, the Army may not frustrate Southern's attempts to receive or perform Army contracts since the Army agreed not to do so when its agents signed the settlement agreement.[13]
 
 
 19
 The district court failed to address the impact that these prior contractual negotiations had on the government's ability to list the Cherokee as a violating facility upon the convictions of the two former Southern employees. H. George Dent, Chairman of the Board of Directors of Southern, maintains that the EPA knew of the administrative settlement negotiations and participated with Southern and the Department of the Army in the execution of the global settlement. Dent also asserts that it was the parties' intent that in consideration for the Administrative Settlement Agreement, the government would not seek additional criminal, civil or administrative sanctions against Southern as a result of the 1988 dumping incident. Accordingly, Southern maintains that the government has breached its agreements with the company by placing the Cherokee on the ineligible list.
 
 
 20
 It is the court's opinion that only the plea agreement with the United States Attorney is binding on the government as a whole and implicates the section 508 listing. Though Southern's agreement with the Army contains a broad definition of "government," the fact of the matter is that the government as defined is not a party to the agreement and made no promises to Southern within the agreement. Accordingly, we address only the last plea agreement entered into between the United States and Southern.
 
 
 21
 Where the government breaches a plea agreement, the defendant is entitled to a proper remedy. United States v. Harvey, 791 F.2d 294, 300 (4th Cir.1986) (citing Santobello v. New York, 404 U.S. 257 (1971); Mabry v. Johnson, 467 U.S. 504 (1984)). This court addressed the binding nature of plea agreements in Harvey, supra, wherein the defendant moved for the enforcement of his plea agreement executed with the United States Attorney's office in the Eastern District of Virginia. The question on appeal was whether the United States was obligated under the plea agreement not to prosecute the defendant under a South Carolina federal indictment. Id. at 298. We indicated that private contract law governs the interpretation of plea agreements, noting, however, that in a criminal case the defendant's contractual rights are grounded in the Constitution and thus distinct from those of non-criminal, private parties. Id.; see also United States v. Burns, 990 F.2d 1426, 1433 (4th Cir.) (analogy of plea bargain to private contract is imprecise because defendant has constitutional rights in plea bargain greater than those of private party to contract) (citing Mabry v. Johnson, 467 U.S. 504, 509 (1984)), cert. denied, 113 S.Ct. 2949 (1993). In addition, we acknowledged in Harvey the court's duty to protect not only the defendant's constitutional rights in the agreement but the integrity and public confidence in the federal government. Harvey, 791 F.2d at 298 (citing United States v. Carter, 454 F.2d 426, 428 (4th Cir.1972)). Accordingly, this court cautioned that neither party to a plea agreement could, on its own, "renege or seek modification simply because of uninduced mistake or change of mind." Id. (citing Santobello, 404 U.S. at 261, 262).
 
 
 22
 In accordance with general contract principles which construe ambiguities against the drafting party, we stated in Harvey that the government must be held to a higher standard than the defendant for any ambiguity in the plea agreement. Id. at 300-01 (citations omitted); see also United States v. Dixon, 998 F.2d 228 (4th Cir.1993) (government responsible for ambiguity in plea agreement). Where an agreement is ambiguous in its terms, the terms must be construed against the government unless extrinsic evidence elucidates the parties' intent. Harvey, 791 F.2d at 303; accord United States v. Garcia, 956 F.2d 41, 44 (4th Cir.1992) (holding government to promise made in cover letter attached to plea agreement and declining to apply strictly the parol evidence rule). In Harvey, where the relevant term in the agreement generated different interpretations, we held the term ambiguous. Harvey, 791 F.2d at 302. Accordingly, we extended the plea agreement in Harvey, which had been negotiated by the United States Attorney out of the Eastern District of Virginia, to the "Government at large," which included the South Carolina United States Attorney's office. Id. at 303.
 
 
 23
 Southern is essentially arguing that the government performed a unilateral modification of the terms of the plea agreement by listing the Cherokee on the List of Violating Facilities, thereby penalizing Southern for the criminal convictions of its two former employees. This court has already stated, in Harvey, supra, its intent to prohibit the government from backing out of its agreements. Indeed, the constitutional rights of the defendant demand nothing less from this court than enforcement of the terms of the plea agreement.
 
 
 24
 The language of the parties' 1992 plea agreement provides that the government will not pursue additional criminal sanctions against Southern for violations arising out of the February 1988 dumping. The agreement states that the government will not seek additional "criminal enforcement activities" (JA 80). Southern argues that EPA's listing of the Cherokee is a criminal enforcement measure precluded by the agreement. On the other hand, EPA argues that the listing is civil in nature and therefore beyond the scope of the plea agreement. See Reply Brief at 12 (citing Shane Meat Co., Inc. v. U.S. Dept. of Defense, 800 F.2d 334, 338 (3d Cir.1986), and Caiola v. Carroll, 851 F.2d 395, 398 (D.C.Cir.1988)).
 
 
 25
 Because the district court did not address the effect of the plea agreement on the mandatory listing, we do not have the benefit of application of the Harvey principles which we find instructive. We think the district court is in a better position to determine first-hand the clarity or ambiguity in the terms of the parties' agreements and the existence of any non-written representations made contemporaneously with the execution of the plea agreement which would bind either party.[14] Specifically, the court below should consider, in accordance with the principles of Harvey, whetherp 6 of the plea agreement, wherein the government specifically represents that it will not seek additional criminal enforcement sanctions against Southern, applies to the mandatory listing of one of Southern's dredges on the List of Violating Facilities. Where the listing of the Cherokee constitutes a criminal enforcement measure, it would appear that the government has breached its agreement with Southern. In such case, the Plaintiff's request for removal of the Cherokee from the list should be sustained to maintain fundamental fairness in plea bargaining.
 
 IV.
 
 26
 Accordingly, we vacate the judgment of the district court below and remand for further proceedings consistent with the principles articulated herein.
 
 VACATED AND REMANDED
 
 
 [1]
 Section 1311(a) prohibits the discharge of any pollutant. Id
 
 
 [2]
 The terms of the Administrative Settlement provided that Southern would plead guilty to a one-count felony information for illegal dumping, pay a $100,000 fine and be placed on a three-month debarment from November 1, 1990 to January 31, 1991. JA 24, 72
 
 
 [3]
 The company headquarters was also placed on the General Services Administration's (GSA) "List of Parties Excluded from Federal Procurement or Nonprocurement Programs." JA 74
 
 
 [4]
 The Office of Enforcement also indicated in its letter that the Cherokee would be placed on the GSA's "Lists of Parties Excluded from Federal Procurement and Nonprocurement Programs." JA 88
 
 
 [5]
 The employees, William J. Floyd and Douglas M. Floyd, were specifically convicted of violating 33 U.S.C. Secs. 1311(a) and 1319(c) of the Clean Water Act. In addition to the criminal convictions, the employees were administratively debarred from participation in federal contracts until July 1, 1994 (Douglas Floyd) and July 1, 1995 (William Floyd). JA 131-32
 
 
 [6]
 Specifically, Southern terminated the Floyds upon learning of the violation; served a three-month debarment period ending January 31, 1991 pursuant to the settlement agreement; and implemented an environmental awareness program, including the installation of an on-site bilge water treatment facility. JA 93-94
 
 
 [7]
 The appeal to the final administrative level was adjudged moot following the judgment of the district court below
 
 
 [8]
 See 40 C.F.R. Sec. 15.4
 
 
 [9]
 The government maintains that the district court erred in holding that section 508(a) of the Clean Water Act, 33 U.S.C.Sec. 1368(a), precludes the mandatory listing by the EPA of the Cherokee on the EPA's List of Violating Facilities. However, for purposes of argument on appeal, the government accepts the district court's conclusion that the statute is facially inapplicable to Southern since Southern has not been convicted of a Clean Water Act violation
 
 
 [10]
 Defendants cite the Conference Report, S.Rep. No. 92-1236, 92d Cong., 2d Sess. 147 (1972), reprinted at 1972 U.S.C.C.A.N. 3824, for the expression of congressional intent "that the Federal Government will not patronize or subsidize polluters through its procurement practices and policies."
 
 
 [11]
 Reference to subsection (c) ofSec. 1368 is omitted in the United States Code Annotated version, but the Historical Note to that section indicates that "Subsec. (c) authorized the President to cause to be issued, not more than 180 days after October 18, 1972, an order (1) requiring each Federal agency authorized to enter into contracts or to extend Federal assistance by way of grant, loan, or contract, to effectuate the purpose and policy of this chapter, and (2) setting forth the procedures, sanctions and penalties as the President determines necessary to carry out such requirement." 33 U.S.C.A. Sec. 1368 (Historical Note) (West 1986)
 
 
 [12]
 Defendants also suggest that the legislative history of the relevant section here illustrates congressional intent that the Executive Branch would adopt regulatory measures for violations of the Clean Water Act similar to those promulgated to achieve the purposes of the Clean Air Act. Indeed, Defendants maintain that Executive Order 11,602, superseded by Executive Order 11,738, was in effect when Congress enacted the Clean Water Act in 1972 and provided that the EPA would list "facilities which have given rise to a conviction for an offense" under the Act. Executive Order 11,602, 36 Fed.Reg. 12475 (June 29, 1971), reprinted at 42 U.S.C. (1970 Supp. II) 1857h-4 note. Defendants ask the court to acknowledge that Congress was aware of the Executive Order in effect at the time the legislation was drafted and that the legislation was drafted in accordance with the executive pronouncement
 
 
 [13]
 Plaintiff claims that the Army had the authority to grant exemptions from being listed as ineligible to participate in federal contracts under 33 U.S.C. Sec. 1368(d). This section provides that "the President may exempt any contract ... from all or part of the provisions of this section where he determines such exemption is necessary in the paramount interest of the United States and he shall notify Congress of such exemption." Id. The execution of the settlement agreement, Plaintiff insists, effectuated such exemption. As expressed below, the court disagrees. Whereas the United States Attorney has the authority to bind the government, the Army does not
 
 
 [14]
 This court does not construe p 7 of the plea agreement as a total integration clause, since the paragraph does not prohibit introduction of representations made contemporaneously with execution of the plea agreement. The paragraph refers to the nullification of "any and all other promises, representations and statements, whether made prior to or after this Agreement" but does not speak to those statements made contemporaneously with the Agreement